Hay, Judge,
delivered the opinion of the court.
This is a suit brought by the United States Fidelity & Guaranty Co. of Maryland against the United States. The facts are that on September 23, 1905, Prendergast & Clark-son, a construction firm of Chicago, entered into a contract with the United States for the construction of the Shoshone Dam in the State of Wyoming. They were to receive the sum of $515,730 for its construction. The two contractors actually expended over $1,000,000 on this work. The plaintiff became the surety for Prendergast & Clarkson, and executed and delivered a bond to the United States in the penalty of $100,000, guaranteeing on the part of Prendergast & Clark-son the performance. of the contract aforesaid. The said Prendergast & Clarkson began work on the contract and continued the work until August 10, 1906, on which date the Secretary of the Interior suspended their contract and took possession of their plant and equipment under circumstances to be detailed later in this opinion.
The site of the dam was located in a narrow canyon, 5,000 feet above sea level. The approach to this canyon was almost inaccessible, and through it flowed the Shoshone River, a non-navigable stream in the State of Wyoming. This river flowed with a variation of volume from a few hundred to 12,000 second-feet. The floods in this river, owing to melt *574 ing snow, as a rule, continued for some time in April until August. At the time of the execution of the contract with Prendergast & Clarkson one Trimmer owned a tract- of land situate on the Shoshone River about 1{- miles above the canyon where the dam was proposed to be built. Upon this tract of land was a sawmill, and across the river at that point was a log boom, which at that time was being operated by the Wallop & Moncreiffe Lumber Co., under a lease from said Trimmer. This land of Trimmer was within the reservoir site and would be flooded when the dam was completed. The lumber company operated the sawmill for the public generally. At the time the contract was entered into by the defendants with Prendergast & Clarkson the United States had no control over the land of Trimmer, nor over the sawmill situate thereon.
On October 26,1905, the defendants, through agents of the United States Reclamation Service, entered into an agreement with Trimmer and wife for the purchase of the land, on which was located the sawmill above referred to. Among other things this contract provided that “ Trimmer and wife might retain possession and have the use of said land until they were dispossessed by the water, notwithstanding the earlier delivery of the deed.”
Among other provisions of the contract it was provided that témporary works shall be erected by the contractors for the purpose of diverting the waters of the Shoshone River from the proposed site of the dam. These works were to comprise a temporary diverting dam, and temporary flume, and a Averting tunnel. These works were to be completed under the terms of the contract on or before March 8, 1906, having special reference to the annual occurrence of the flood season. The dam and 840 feet of the flume and the tunnel were not completed on the 3d day of March, 1906, but they were completed before the flood season of 1906 began. Early in June of the year 1906 the floods in the river began, and on June 13, 1906, the log boom of the Wallop & Moncreiffe Lumber Co. broke, and the water and logs released by it wrecked the flume and seriously injured the diverting dam built by Prendergast & Clarkson. It cost Prendergast & Clarkson $24,986 to construct this flume.
*575 After the execution of the supplemental contract by the plaintiffs, on September 10,1906, the defendants entered into a contract with the Wallop & Moncreiffe .Lumber Co., by which it was agreed that the lumber company would furnish the United States Reclamation Service with 1,000,000 feet b. m. of lumber, which the defendants needed for a project other than the Shoshone Dam project. Before the flood season of 1907 Wallop & Moncreiffe applied to the State engineer of Wyoming for a permit to drive logs and other timber, submitting with said application plans for the construction of a log boom across the river from the site of their sawmill, which they were occupying under a lease from Trimmer as aforesaid. This application was approved by the State engineer of Wyoming on February 25, 1907. The log boom was built by the lumber company in accordance with the plans submitted to the State engineer, and these plans had been approved by the Government engineer in charge of the work on the dam which ivas being constructed by the plaintiff. Whether the engineer employed by the plaintiff formally approved these plans does not appear, but it does appear that they were submitted to him and he did not object to them.
The plaintiff, in the fall of 1906 and the spring of 1907, proceeded to repair the damage done to the temporary dam by the flood of 1906, and to rebuild the temporary flume, and to complete the lining of the diverting tunnel. The flume was built of larger timber and made longer than the flume which had been washed away. The temporary diverting works were completed before the floods of 1907. The flood of 1907 came in the early part of July, and at midnight of July 3 the logs which had been assembled along the banks of the river above the boom reached the boom, jammed against it, and broke it. These logs in large numbers were driven upon the temporary diverting works of the plaintiff; they were piled against and upon the diverting dam of the plaintiff ; the dam was punctured and a 100-foot section of the dam was carried away, and the work of the plaintiff was flooded, and it was greatly delayed in the prosecution of the work. It cost the plaintiff the sum of $38,650.50 to rebuild the diverting flume, and to repair the damages to the diverting *576 clam done by the flood of 1906, $14,700, and the sum of $22,250 to repair the damages done by the flood of 1907 to the diverting dam.
The contract provided for the building of a tail flume, and also for the construction of a curtain wall. The Government engineers could not agree upon the location of the tail flume, and the postponement of the tail flume was responsible for the delay in the construction of this curtain wall.
On October 28, 1907, the defendants caused the diverting flume to be cut and the waters of the river returned to their natural channel through the canyon. The plaintiff was therefore prevented from proceeding with the excavation in the bed of the river for bedrock foundation for the permanent dam. This suspension of excavation for bedrock necessarily continued for 35 days; and during the time of this suspension the defendants had installed, at their own expense, at the portal of the intake of the diverting tunnel, a concrete and iron structure not required by the contract nor shown upon the contract plans. This structure when completed proved to be a grill which extended across the portal of the tunnel at right angles to its axis. This grill obstructed the flow of water into and through the diverting tunnel, and reduced its capacity to divert the waters of the river to less than one-half its capacity prior to the installation of this grill, and to less than one-half of the diverting capacity of 2,000 feet per second guaranteed to the plaintiff by the terms of the contract. Upon this grill debris and drift .of all sorts collected and further restricted the diverting capacity of the tunnel.
The contract provided for the construction of a curtain wall, which was to be constructed in advance of any other portion of the dam. Its purpose was to act as a temporary dam for diverting the water of the river into the outlet tunnel in case the temporary flume would not. It was designed also to prevent the filling of the foundation pit with rock and gravel, and was a protective measure to enable work on the dam to be carried on with expedition and dispatch when the water had risen. In short, it was a feature of the utmost importance to the successful and expeditious prosecution of the work. As tersely stated by Mr. Cole, the constructing *577 engineer of the defendants, “ It was a vital thing.” It was provided in the contract that it should be 15 feet in thickness at the base, and battering to a thickness of 3 feet at the top. Its elevation was to be 5,158, which is 18 feet higher than, the bottom of the tunnel, and 31 feet above the river bed, and it was estimated that it would have increased the diverting capacity of the tunnel 3,500 second-feet.
The plaintiff was required, over its protest, to build the curtain wall at a different location than that specified in the contract drawings, and to build it of a different design than that called for in said drawings. It was required to construct it more than twice as broad at its base; it was also required to rack it or step if upon its downstream face, thus prolonging its construction. On April 11, 1908, it had been built to an elevation of onlv 15 feet below the river bed. Further delay in the building of the curtain wall was also caused by the failure of the defendants to deliver at the site of the dam cast-iron pipes for the construction of two discharge pipe lines through the dam at the elevation of the bed of the river; these pipes were not included by the terms of the contract in the work of the plaintiff.
The flood of 1908 season began on April 11, 1908.
The location of the dam is shown upon the drawings which are parts of the contract. The contract also provided that no work depending upon location and grades should be undertaken until they had been given by the engineer of the defendants. The foundation for the dam was fully excavated on February 22, 1908, at the site shown upon the contract drawings. It was then made ready for the placing of concrete in the curtain wall. The engineer of the Government then changed the location of the dam, and required the plaintiff to make additional excavation 12 to 15 feet in width up the stream from the location fixed by the contract and from the foundation which had been uncovered. Bedrock at the new location was 80 feet below the river bed, and the plaintiff was obliged to excavate to a depth of 20 feet 4 inches below the uncovered foundation. This change in the location of the dam caused additional delay in the placing of concrete and in completing the work under the contract.
*578 The obstruction of the tunnel caused by the installation of the grill and the failure to erect the curtain wall caused the overflow of the flume which resulted in the filling up with water, rock, gravel, and sand the foundation pit which had been dewatered and excavated before the overflowing of the flume on April 11, 1908, and on May 2, 1908. After the flume ceased to overflow, on August 28, 1908, the plaintiff began the reexcavation of the foundation pit, which it finally completed on September 23,1908, when, on October 14,1908, the work was again overflowed, the overflowing being due to the same causes; and the work had to be again done over.
There was contained in the dam 75,242 cubic yards of concrete. The change in the location of the dam, the installation of the grill at the portal of the tunnel, the obstruction of the tunnel caused thereby, the delay in building the curtain wall, and the flooding of the works which resulted, caused great delay to the plaintiff in placing concrete. This delay was caused by the defendants, without the fault of the plaintiff. The plaintiff, as a consequence, was compelled to do a large amount of concrete work in the winter seasons, which greatly increased the cost of the work. Extensive plants had to be installed, work had to be done with much less expedition, and labor had to be paid higher wages.
Under the facts above detailed the court has in the findings set out more particularly the facts as to the items of the claim of the plaintiff, and has in its conclusion allowed the plaintiff the amount of $322,164.67. Most of this amount, as the findings show, results in large measure from the delay caused by the defendants and the failure of the defendants to comply with the contract. It is not thought necessary to repeat here in detail the findings as to each of these items, as the findings are specific and speak for themselves.
Of the amount disallowed ($454,656.46), the first items to be considered will be those items which are based upon the damages done to the temporary diverting works of the plaintiff by the log boom placed by the Wallop & Moncreiffe Lumber Co. across the .Shoshone River about miles above the site of the work. These items amount to the sum of $100,586.
The theory and contention of the plaintiff is that by virtue *579 of tbe contract of the defendants with Trimmer and wife to purchase the land upon which was situated the sawmill site operated by Wallop & Moncreiffe under a lease from Trimmer, the defendants had control of said sawmill and log-boom and of the logging operations; and contend further that Wallop & Moncreiffe were the agents of the defendants by reason of the fact that Wallop & Moncreiffe had entered into an agreement with the defendants to furnish them a large amount of sawed lumber for the use of a project of the defendants not connected with the building of the Shoshone Dam, and that any act of the lumber company which interfered with or resulted in damage to the works of the plaintiff must be made good by the defendants; and that the defendants must pay to the plaintiff the damages sustained by it from the breaking of the log boom in the years 1906 and 1907.
The facts are that in the agreement for the purchase of the land from Trimmer, upon which was situate the sawmill site, there was a clause which provided that Trimmer should have the possession and the use of said land until it was overflowed by the water, notwithstanding the deed might be earlier delivered. Trimmer therefore retained the use and possession of the land free from any control thereof by the United States. At the time the agreement for purchase was made the sawmill was on the land and was being operated. Furthermore, before the United States entered into the agreement for the purchase of the land from Trimmer, and before the contract made by the defendants with Prendergast & Clarkson for the construction of the dam, Trimmer had leased the sawmill to Wallop & Moncrieffe, who were operating the same, and were maintaining a log boom across the river about 1J miles above the proposed site of the dam. Of this fact Prendergast & Clarkson had notice, as it appears from the evidence that they visited the proposed site of the dam before they executed the contract for its construction. In so.far as they were concerned they must have taken into consideration the menace which the possible breaking of the log boom must have been to the temporary diverting works which they had to construct for the diversion of the water. *580 But at all events the United States had no control over this log boom nor over the operations of this sawmill. The mere fact that the defendants had contracted for the sawing of lumber at the sawmill, just as any other customer might have done, and as others did do, did not entitle the defendants to control its operations, nor impose upon them any responsibility as to its operations or conduct. Nor can it be said that the defendants incurred any liability for what might happen in the event of the breaking of the boom and consequent injury to the works of Prendergast & Clarkson.
The defendants, as has been pointed out, did not control this land nor any part of it. The plaintiff had full notice of the terms of the agreement for the purchase of it, and was informed of the breaking of the log boom in 1906. The Shoshone River was a nonnavigable stream under the control of the State of Wyoming. Wallop & Moncreiffe, in compliance with the laws of that State, made application to its State engineer in the fall of 1906 for a license or permit to operate the sawmill and to construct the log boom. This license was granted in February, 1907, upon the condition that the log boom should be built with a view to protect the temporary diverting works of the plaintiff. It was built upon a plan approved by the Government engineers, a plan shown to and not objected to by the engineer of the plaintiff, although no obligation rested upon Wallop & Moncreiffe to obtain the approval of either the one or the other. Nor can any liability be inferred to have been, incurred by the defendants, because their engineers approved of the plan for the construction of the boom — a boom over which the defendants could not have legally exercised any control, nor could they have- legally prevented its being placed across the stream. The very terms of their contract with Trimmer gave to him the use and the possession of the land, and there was nothing in their agreement with him which would have entitled them to prescribe the character of the use which Trimmer might make of the land, so long as that use was legal and within the terms of their contract with him.
Nor can it be said that Wallop & Moncreiffe were the agents of the defendants, and that therefore any acts of *581 theirs were binding upon the defendants and made the defendants responsible for the consequences of those acts. It is true that Wallop & Moncreiffe entered into a written agreement with the defendants whereby they agreed to furnish the defendants a certain number of feet board measure lumber at a price fixed in the contract, but such an agreement does not make the defendants responsible for the acts of Wallop & Moncreiffe in the operation of their sawmill. The defendants were merely purchasers from a private firm which was selling an article of commerce. To say that the United States must be responsible for the operations and the consequences arising therefrom of every firm with which' it may deal is untenable, and can not be sustained by any principle of law known to the court.
From the facts in this case it is not perceived how any contractual relation can be implied between the defendants and the plaintiff arising from the transactions of the defendants with either Trimmer or with Wallop & Moncreiffe.
And the result would not be different if the Government owned or controlled the sawmill and boom. The fact of its having contracted with plaintiff that the latter erect a dam did not serve to prevent its operating the sawmill and boom upon the river, such structures not being in their nature or operation unlawful. The duty to use ordinary and reasonable care to have a boom suited to its purposes and that would be sufficient to sustain the weight of logs upon it, even at times of high water, is the same and not different when the Government is involved and when an individual is involved. In either case the liability for injury to the works or property of another caused by a breaking of the boom would be determined by the fact whether due care had been exercised in the construction or the maintenance of the boom; in other words, whether or not there had been negligence. The plaintiff’s damages' in such case would necessarily sound in tort, and the United States can not be sued for tort. Bigby Case, 188 U. S., 400.
The other amounts disallowed by the court consist in cutting down the amount claimed on some of the items allowed, which are shown in the findings, and in disallowing some items as a whole. The findings sufficiently explain *582 themselves, and it is not necessary to go over them in detail here.
Judgment will be entered for the plaintiff in the sum of $322,164.67, under Findings VXII, X, XII, XIII, XIV. XVII, XIX, XXI, XXII, XXIII, and XXIV. The other items of plaintiff’s petition are dismissed.
It is so ordered.
DowNEy, Judge; BarNey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.