Littueton, Judge,
delivered the opinion of the court:
Under the 36 separate and distinct claims asserted, plaintiffs ask judgment in the total amount of $452,627.52. The material and essential facts established by the record are set forth in the findings separately with respect to every claim asserted under a title showing the nature and character of each claim made. The work called for under the contract in suit was extensive in character and amount, difficult of construction and performance, and involved the preparation of the site and foundations for the construction of a large concrete dam and appurtenant structure across the Chagres River, Canal Zone, Isthmus of Panama, and various earth and concrete dams on each side of the river. The work was of such character and was required to be performed and completed under such circumstances that it was necessary for plaintiffs to make a great outlay in money for construction, erection, and adaptation of plant and facilities to render them adequate and sufficient to perform the work as specified and definitely called for by the contract and the detailed specifications within 1,350 calendar days after receipt of notice to proceed. The entire work was completed and accepted within the agreed time. This was a unit price contract. The total contract price in accordance with plaintiffs’ bids on the various units of work called for by the plans, drawings, and detailed specifications was based strictly on 95 separate and distinct units of work and estimated quantities specified in the contract and upon the 166 separate, distinct, and specific numbered paragraphs of the specifications which meticulously described the work required and how it should be done; all of these were prepared by the defendant and were required to be accepted and carried out by plaintiffs. The nature and character of each unit of work required to be performed was designated and specified by the defendant in the 95 original schedules under art. 1 of the proposed contract which was submitted to plaintiffs and upon which they made their bid. The dam was designed and the contract and detailed specifications were prepared by the defendant through the engineers of the *610 United. States Reclamation Service. The specifications discussed generally and separately, and meticulously directed in great detail how each of the units of work called for was required to be performed and the basis of payment for each item of work, if and when performed strictly in accordance with such detailed and specific directions and instructions of the specifications. These specifications were a part of the contract between the parties. The contract and specifications authorized and provided for changes in the plans and specifications and called for an equitable adjustment in the specified unit prices if such changes caused an increase in the amount due under the contract. Reasonable changes in design or location which did not increase the costs of doing the specified units of work, but which might increase the amount of work to be done at the unit prices, were also authorized without payment in excess of the unit price for such work. Extra work orders for additional work not called for were provided.
At this point it should be stated that practically all the decisions and recommendations of the contracting officer and the head of the department in regard to practically all the claims in suit were based upon constructions which they placed upon certain articles of the contract and the specifications, rather than upon their findings upon disputed questions of fact. Plaintiffs in practically every instance duly and timely protested and appealed with respect to the claims here involved, which arose from (1) directions and instructions of the engineers and inspectors immediately in charge of the work; (2) rulings and orders of the construction engineer and written changes made and ordered by the contracting officer. The protests and claims were made to the construction engineer, to the engineer of maintenance, who was the duly authorized representative of the contracting officer and who acted as the contracting officer in the matter of protest; and, to the Governor of Panama, Canal Zone, who, in addition to being the official contracting officer, was the head of the department concerned. A few of plaintiffs’ protests were not made within 10 days, but the contracting officer did not reject any of them on that ground but considered and decided them on the merits. By so doing he waived the *611 10-day provision. Thompson et al. v. United States, ante, p. 166. The contracting officer was expressly authorized to extend the time.
It should also be here stated, before discussing separately the various claims presented, that the construction engineer, the engineer of maintenance who, under proper authority, acted as the contracting officer, and the head of the department in each instance so far as the claims here made are concerned, and as is clearly established by the evidence, resolved all doubts strictly in favor of the Government and against plaintiffs in their rulings and decisions when interpreting various articles of the contract and • specifications in connection with plaintiffs’ protests and claims. In these protests and appeals plaintiffs claimed that under the instructions and orders given by the construction engineer and the contracting officer and under changes made and ordered in writing they were entitled, under the contract and specifications, to be paid for the extra expenses incurred by reason of being required to perform certain specified units of work in a manner different from and more expensive than that contemplated and specified in the contract and specifications. It is so well established as not to require citation of authority that in circumstances such as presented by this case, such manner and method of interpretation'and construction of the contract and specifications by‘the defendant were erroneous and unauthorized. Where an instrument, especially one of;such character as is involved in this suit, is drafted and prepared entirely by one party thereto, and is specific in its detailed requirements, subsequent doubts as to the meaningt and applicability of (the language and provisions thereof to definite facts, conditions, situations, and circumstances should not be interpreted and construed in favor of the party who drafted and ¡prepared it, but, on the contrary, in such cases the provisions of such instrument should, in case of doubt and in such circumstances, be interpreted; more favorably to the other party who did not and could not, in the circumstances, have anything to say as to the language and provisions of the instrument as prepared. The reason for this rule is that since the contract, the detailed drawings, and the specifications were not the result *612 of negotiations between the parties before execution it is only reasonable to presume that the party who prepared and wrote the ; contract, drawings, and specifications intended to express or clearly indicate his requirements in the language used rather than leaving them to be determined by resolving doubts and inferences in his favor.
Before discussing and deciding the several claims presented, reference will here be made to certain general provisions of the contract and specifications which relate directly or in some degree to a number of the claims involved. These, for the most part, are the general provisions which are found in practically all Government contracts and specifications. Other provisions which specifically relate to certain claims will be referred to and discussed in connection with the specific claim to which they are applicable.
Art. S of the contract, relating to changes, provided that the contracting officer might at any time by written order make changes in the drawings and/or specifications of the contract, within the general scope thereof; that if such changes caused an increase or decrease in the amownt d/we under the, contract an equitable adjustment would be made and the contract modified in writing accordingly; that no changes involving an estimated increase or decrease of more than $500 should be ordered unless approved in writing by the head of the department or his duly authorized representative, and that any claim by the contractor for adjustment under this article must be asserted within 10 days from the date the change was ordered, unless the contracting officer should for proper cause extend such time, and that if the parties could not agree upon the .adjustment the dispute should be determined as provided in art. 15. This article was interpreted to mean that only “Extra Work Orders” under article 5 had to be approved by the head of the department.
Art. 15,, relating to disputes, provided that, except as otherwise specifically provided, all disputes concerning questions of fact arising under the contract should be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within *613 30 days to the head of the department concerned, whose decision should be final and conclusive upon the parties as to such questions of fact.
Paragraph 6 of the specifications provided that if the contractor considered any work demanded of him to be outside the requirements of the contract and specifications, or considered any record or ruling of the contracting officer to be unfair, he should immediately request the contracting officer for his written instructions or decision, and that the contractor should furnish the contracting officer a written protest stating clearly the basis of his objections; and that unless the contractor furnished such written protest it would be considered that the contractor had accepted the instructions or decision of the contracting officer. It-will appear from the consideration and discussion as hereinafter set forth that in a number of instances the contracting officer failed to comply with art. 3 and to perform certain duties required of him thereunder. He made and ordered a number of written changes in the original contract drawings which also operated to change the specifications (see art. 2), which changes caused obvious increases in the costs of performing the unit of work, as changed, over what the work as originally specified and called for would have cost. However, in making such changes, he seems to have given no consideration to the factual phase concerning increased costs, but assumed the right to order the changes without regard to increased costs thereof under the supposed authority of paragraph 43 of the specifications, hereinafter mentioned. On that ground plaintiffs’ protests, claims, and appeals were denied. See Newport Contracting & Engineering Co. v. United States, 57 C. Cls. 581, 587. We think paragraph 43 did not in any way limit or modify the provisions of art. 3 of the contract, which required consideration and determination of increased costs resulting from changes and the making of an equitable adjustment on account thereof. A reading of art. 3 and paragraph 43 together will show that the latter was drafted with measured caution so as not to conflict with art. 3, and simply as a means and for the purpose of avoiding future claims for compensation at larger *614 unit prices or for extra work at cost plus overhead and profit (art. 5 and par. 3), in respect to increased quantities of work reasonably to be expected as a result of information subsequently obtained as indicated, and of the type and character for which a unit price had been fixed. Paragraph 43 protects the contractor by specifying (1) the kinds of changes that may be made, (2) the basis therefor, (3) that they must be reasonable, that is, that they must be reasonably within the contract units of work and prices, and (4) that changes in design, location, dimensions, etc., which increase quantities of specified units of work, should not be extended unreasonably beyond the limits of the contractor’s plant and operations without an equitable adjustment under art. 3.
Art. 5 of the contract provided that, except as otherwise provided therein, no charge for any extra work or materials should be allowed unless the same had been ordered in writing by the contracting officer and the price stated in such order; and paragraph 3 of the specifications provided as follows:
The contractor shall, when ordered in writing by the contracting officer, perform extra work and furnish extra material, not covered by the specifications or included in the schedule, but forming an inseparable part of the work contracted for. Extra work and material will ordinarily be paid for at a lump sum or unit price agreed, upon by the contractor and the contracting officer and stated in the order. Whenever in the judgment of the contracting officer it is impracticable because of the nature of the work or for any other reason to fix the price in the order, the extra work and material shall tie paid for at actual necessary cost as determined by the contracting officer, plus 15 percent for superintendence, general expense and profit. The actual necessary cost will include all expenditures for material, labor, and supplies furnished hy the contractor, and a reasonable allowance for the use of his plant and equipment, where required, to be agreed upon in writing before the work is begun, but will in> no case include any allowance for office expenses, general superintendence, or other general expenses.
The defendant issued a number of extra work orders under which plaintiffs were paid for certain extra units of work, *615 which orders were in addition to the units of work called for and specified in the contract. Only 2 of the claims here involved relate to failure to pay under and in accordance with an extra work order. No defense is made to any claim in suit on the ground that it was “extra work” under art. 5’and paragraph 3, for-which no extra work order was asked or issued. Practically all the claims, with respect to which plaintiffs were required to protest and make claim, grow out of specified units of work with respect to which change orders were made, or in connection with which plaintiffs claim they suffered increased costs and damages by reason of alleged unreasonable requirements and delay caused by the defendant.
Art. 6 of the contract provided that all material and workmanship should be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture or construction, and at any or all places where the work was being carried on. Plaintiffs were required to, and did, conform to and carry out the instructions and directions of the defendant’s authorized engineers and inspectors immediately in charge of the various units of work.
Art. 18 of the contract provided that the term “contracting officer” should mean the duly authorized representative of the contracting officer. The engineer of maintenance under written authorization by the Governor of the Panama Canal Zone was made the contracting officer for the purpose of the contract, and the construction engineer was also authorized by the head of the department to act as the contracting officer in certain circumstances and under certain articles of the contract and specifications. The engineer of maintenance will hereinafter be referred to as “the contracting officer.”
Paragraph 29 of the specifications gave a general description of the main dam and appurtenant structures with its various features, and paragraph 43, with reference to the right of the Government to change locations and plans, provided that whenever additional information relative to foundations or other conditions became available as a result of excavation work, further test drilling or otherwise, it might be found desirable to change the location, alignment, *616 dimensions, or design of the dams, power plant, or appurtenant works, to meet such conditions; that the Government reserved the right to make such reasonable changes as in the opinion of the contracting officer might be considered necessary or desirable, and that the contractor would be entitled to no extra compensation because of such reasonable changes, except that any increase thereby in the amount of excavation, concrete, or other work required, would be paid for at the unit prices bid and stated in the schedule under art. 1 of the contract; that the contractor’s plant should be laid out and his operations conducted so as to accommodate any reasonable change in the location and design of the various works, or any part thereof, without additional cost to the Government. As hereinbefore stated, the contracting officer rejected and denied many of the protests and claims on the ground that the written changes in the drawings and specifications which were ordered, and which gave rise to the claimed increased costs and expenses, were governed by this paragraph of the specifications.
The rule is well established by the decided cases that in contracts of this character where, as in art. 15 abovfe-mentioned relating to disputes, it is provided that the decision of the contracting officer and the head of the department shall be final and conclusive only as to questions of fact, a decision or ruling on a protest or appeal which involves or is based upon an interpretation and construction of a contract and the specifications is a decision on a ■question of law rather than the determination of a fact and does not preclude the consideration, decision, and determination by the court of the question in controversy, including the facts. Rust Engineering Co. v. United States, 86 Ct. Cls. 461, 473. In Davis et al. v. United States, 82 C. Cls. 334, this court held that the competency of the' parties to a Government contract to stipulate that the decision of disputed questions by the contracting officer of the Government, or by the head of the department on appeal, shall be final and conclusive is limited to questions of fact and, therefore, does not include questions involving construction of the contract which are questions of law. To the *617 same effect is Lyons v. United States, 30 C. Cls. 352, 353, 365; Collins and Farwell v. United States, 34 C. Cls. 294; Albina Marine Iron Works, Ino. v. United States, 79 C. Cls. 714. In Rust Engineering Oo. v. United States, sufra, this court held 'that “Under Art. 15 of the contract only decisions as to questions of fact by the contracting officer and the head of the department concerned, if an appeal was taken, were to be final and conclusive upon the parties. No appeal was required from any decision of the contracting officer, except' as to questions of fact.” In the instant case art. 15 required an appeal only from findings of fact by the contracting officer. With these observations, the several claims in controversy will be considered, discussed, and decided separately on their merit.
Claim 1. $50,776.72 for expenses alleged to have resulted from, flood damage caused by defendant by its clearing operations. — This claim is one for unliquidated damage arising under an alleged implied obligation under paragraph 55 of the specifications. The facts established by the record with reference to this claim are set forth thereunder in findings 7 and 8. They show that certain towers of plaintiffs’ gravel transportation system were wrecked and pulled from their foundations, resulting in serious damage to this cableway system as a result of large logs and debris being carried down the river by high waters from the defendant’s clearing operations some distance above the site of the dam and above the location of the destroyed and damaged towers and system, and that the damage to the gravel transportation system was the direct result of this extra hazard over and in addition to the normal, expected, and anticipated hazards from floods in the Chagres River. This presents the question of law as to whether, in view of paragraph 55 of the specifications, plaintiffs can recover the damages sustained and represented by the cost of replacing and restoring the towers and the damaged portion of the loading plant, transportation cables, and large buckets.
Paragraph 55 provided, so far as material here, that “The contractor shall assume all risk of damage to his *618 plant, equipment, and operations at the gravel deposits, by reason of floods in the water courses adjacent to or through the gravel deposits.” Paragraph 56 of the specifications also provided that “The contractor shall be responsible for and shall repair at the contractor’s expense any damage to the foundations, dams, powqr plant, highways, or any parts of the work caused by floods, or water, or by failure of any part of the protective works.”
The position of the defendant with reference to this claim is that the damage to the transportation system and the destruction of certain towers was not caused by the large logs and debris carried down the river by the floodwaters from the defendant’s clearing operations but by the fact that the natural force of the floodwaters caused the collapse of, the towers by reason of the concrete foundations thereof giving away, due to a scouring effect of the floodwaters. There is no competent or convincing evidence in the record to sustain this defense. There is some testimony in the record by certain of defendant’s witnesses that because certain towers within the floodwaters were demolished and their concrete foundations pulled from tlieir base and carried a short distance down the river, where they were found when the flood subsided, the collapse of the towers “must have been caused by the scouring effect of the floodwaters.” But there is competent and convincing evidence in the record which we think clearly establishes that the loading plant and these towers were so designed and constructed as to withstand even somewhat more than the normal and expected consequences of any flood as great or even greater than had theretofore occurred in that river and that, except for the extra, unusual, and unanticipated hazard of the large logs and debris carried down from defendant’s clearing operations, these towers would have withstood, without damage, the natural consequences of the flood and such debris as was in fact carried down from the jungle above the site of the dam. Other evidence in the form of photographs made immediately after the flood had subsided fully supports this testimony. These photographs show that there was no destructive scouring effect by the floodwaters at or in the vicinity where the destroyed towers were lo *619 cated. They further show that a number of large logs up to 8 feet in diameter and 80 feet in length were entangled with portions of the destroyed towers and entwined and entangled with the steel transportation cables attached to the towers and held thus until the flood had subsided. Other logs from the defendant’s clearing operations were also found held against plaintiffs’ damaged gravel-loading plant at the same location.
We are of opinion that under a proper construction of the provisions of the contract above quoted, the plaintiffs should be held to have assumed only the natural and expected consequences of floodwaters in the Chagres River and that defendant cannot escape liability for the damage which was directly caused by its acts, or acts of its authorized agents, which added extra and unanticipated hazards to the normal and natural risk of danger which, under the language of the contract, the plaintiffs had assumed. The defendant, by its own employees, was carrying on certain clearing operations above the dam and, in addition, it was carrying on such operations through an agent in con-, tract relation with it. The contracting officer under the clearing contract and plaintiffs’ contract was the same person. The defendant’s contract for the clearing operations above the site of the dam was made some time, after plaintiffs’ contract had been executed by the parties. Plaintiffs had the right to expect, and to place upon the above-quoted provisions of their contract the construction, that the defendant would not by any of its operations directly or through its agents add extra or unusual hazards to any flood that might occur, and which was reasonably expected by everyone would occur, in the Chagres River during the performance of this contract. In these circumstances and with full knowledge of the floods that had occurred almost every year, the plaintiffs only assumed the risk of damage by floodwaters and such debris from the jungle above that might be carried down by such floods, and, under the language of the contract, the defendant impliedly agreed to-assume the risk of any additional hazards which it might add to the flood dangers. We think it is clear that the quoted provision of the' contract cannot be construed to *620 place upon plaintiffs the risk of damage directly resulting from additional and unexpected hazards imposed by the defendant, whether or not they were imposed carelessly, accidentally, or otherwise. In The Ohio River Contract Company v. United States, 45 C. Cls. 542, 554, this court said:
The assumption of responsibility by the claimant under specification 44, for the safety of his employees, plant, and materials, and for any damage or injury done by or to them from any source or cause, was not intended by the parties to include damage or injury resulting from the acts of the officers and agents of the United States, nor can the specifications be so construed.
While no implied contract arises solely from a tort, Langford v. United States, 101 U. S. 341, where the Government by a written contract requires the contractor to assume a risk of loss or damage occasioned by the natural consequences of a specified cause, it reciprocally and impliedly assumes an obligation not to interfere in such a way as to increase the hazard of the risk so assumed. “* * * What' is implied in a contract, deed, will, or statute is as effectual as what is expressed (United States v. Babbit, 1 Black, 61). Human affairs are largely conducted upon the principle of implications.” Bulkley v. United States, 19 Wall. 37, 40. Milter v. United States, 49 C. Cls. 276, 282; Guastavino Co. v. United States, 50 C. Cls. 115, 119. The case of U. S. F. & G. Co. v. United States, 53 C. Cls. 580, 581, is distinguishable.
The defendant and its agents engaged in the clearing operations above the site of plaintiffs’ work were fully aware of the floods that had occurred and that probably would occur in the Chagres River during progress of plaintiffs’ work and the defendant’s officers and inspectors were at all times at the site of the clearing operations and were in a position, and it was their duty, to make sure that logs and trees were not permitted to be left where they would be carried down the river and cause damage to plaintiffs. The record in this case offers no excuse for failure of the defendant to do this or to see to it that its authorized agent did so.
The defendant also questions the claimed costs of repairing the damage. The record establishes and we have found *621 as a fact that the amount of plaintiffs’ actual damage, represented by the actual cost of repairing and replacing damaged and destroyed portions of the gravel transportation system, including reasonable overhead expense, was $46,160.-55. The plaintiffs are entitled to recover this amount as compensatory damages.
Plaintiffs also claim the additional amount of $4,616.07 as reasonable profit of 10 percent upon the actual direct expense, but we are of opinion that plaintiffs are not entitled to recover any profit as an element of damage.
Claim 2. $171,801.88 for extra and unnecessary expense alleged to Time resulted cmd been caused by acts of the defendant in connection with the construction of Left Ridge Dam and other fills. — Plaintiffs insist that the extra expense in the construction of Left Eidge Dam and certain other smaller dams making up the amount of this claim represents an expense in excess of that which it was required under the contract and specifications to incur in performing this phase of the work by reason of the facts that (1) the defendant required plaintiffs permanently to waste Madden Dam excavation performed in 1932 instead of using such excavation, as they insisted they had a right to do under the contract, in Left Eidge Dam and other fills; (2) the work of stripping the site of Left Eidge Dam was required by delayed orders of the defendant to be performed in a manner different from any contemplated or called for by the contract and specifications; (3) that the delay in making the change and the performance of extra preparatory work on such foundations delayed the time when the fill could otherwise have been commenced until' after the excavation made from Madden Dam during 1932 had all been wasted; (4) the original contract plans and, therefore, the specifications for Left Eidge Dam and Saddle Dam No. 8 were so changed by the contracting officer as to require selecting, sorting, grading, hand-tamping, and blending of materials, none of which was required under the original plans and specifications; (5) the Left Eidge Dam and Saddle Dam No. 8 fills as finally constructed were entirely different from those specified in the original plans and specifications; and (6) the contracting officer and his duly au- *622 tborized representatives took almost a year to come to a decision as to what revisions, if any, they desired in the original plans and specifications, and the kinds of materials •they wanted in the dams.
The facts establish that the work of constructing Left Ridge Dam and Saddle Dam No. 8, as it was required to be performed by the contracting officer, cost $152,061.69 in excess of what it would have cost had plaintiffs been permitted to perform the work at the time and in the manner as planned and as set forth in their original schedule of work which they prepared and submitted to the defendant in October 1931. The question presented is whether upon the facts disclosed by the record and the applicable provisions of the specifications, the contracting officer or his duly authorized representatives so interfered with the performance and progress of this work by requiring it to be performed in such a way, under such circumstances, and in such manner as was not contemplated by the contract and specifications as would entitle plaintiffs to recover the extra costs so incurred. Plaintiffs duly protested and appealed but the contracting officer and the head of the department refused their claim on the ground that the contract and specifications fully authorized them to require the work of preparing and constructing Left Ridge Dam and Saddle Dam No. 8 at the time, in the manner, and in accordance with the methods and with the material which had been finally specified by the contracting officer. It was therefore held that under the specifications, as so construed, there was nothing due and plaintiffs’ protest and appeal were denied.
Paragraph 69 of the specifications entitled “Embankment construction, general” provided, so far as material here, as follows:
For the purpose of these specifications, the term “embankments,” includes the earth and gravel fill portions and the rock fill portions of the Left Ridge Dam and of all saddle dams; the earth blankets and filling immediately upstream from the Madden and the Left Ridge dams, the dumped rock riprap on the upstream slopes of saddle dams Nos. 8 and 5 * * *. Embankments shall be constructed to the lines and grades established by the contracting officer, which, in general, will be the lines *623 and grades shown on the drawings increased by such heights and widths as determined necessary by the contracting officer to allow for later settlement. * * *. The suitability of all materials for construction of embankments shall be subject to the approval of the contracting officer * * Except as otherwise provided for highway embankments, all portions of required embankments, whether constructed from materials excavated for other required parts of the work, from borrow pits or from quarries, will be measured and paid for in embankment, and where the materials are excavated for other required parts of the work payment for placing the materials in embankments will be in addition to the payment made for the required excavation. * * * the unit prices bid for fills or embankments shall include the cost of excavating the materials in the borrow pits, of hauling the materials to the embankments and placing the materials as specified. It should be feasible to transport a large portion of the materials, which are excavated for other required parts of the work and which are suitable for embankment construction, direct to the embankments at the time of making the excavations. However, the contractor shall be entitled to no additional compensation above the prices bid for exacavation and embankments by reason of it being necessary or required, on any account, that such excavated materials be deposited in spoil banks prior to transporting to the embankments.
There were a number of embankments, other than those involved in this claim, which pther specifications required be constructed.
It should be noted that this paragraph of the specifications was a general provision relating to embankment construction in general. There were other numbered paragraphs which related specifically and in greater detail to the Left Ridge Dam and Saddle dams.
Paragraph 7i of the specifications entitled “Earth Fill in Left Ridge Dam” provided, so far as material here, as follows:
The earth-fill portion of the Left Ridge Dam shall consist of the natural mixture of clay, silt, sand, and gravel available from the foundation excavation for the Madden Dam from borrow pit CR-2, or from other approved borrow pits. Separation, sorting, blending, or segregation of the materials will be required only to *624 the extent that, in the case of power shovel or equivalent methods of excavation, the embankment materials shall be mixed and blended by the usual process of excavating against a vertical face and, in the case of team or equivalent methods of excavation, the loading shall be carried on simultaneously in different parts of the excavation yielding different kinds of materials, and that, regardless of the methods of excavation, the dumping of the successive loads from the different parts of the borrow pits or required excavation shall be in locations on the embankment as directed or approved by the contracting officer. * * * Measurement for payment will be made of the materials in place in the fill after compacting by moistening and rolling and after cutting back the upstream slope as specified. Payment for constructing the earth fill described in this paragraph will be made at the unit price per cubic yard bid in the schedule for earth fill in Left Ridge Dam.
Paragraph 75 of the specifications entitled “Earth fill in Saddle Dam No. 8” provided as follows:
The earth-fill portion of Saddle Dam No. 8, including the fill in the cut-off trench on each side of the core wall, shall consist of the natural mixture of clay, silt, sand, and gravel available from the foundation excavation for the Madden Dam, from borrow pit CR-1, or from other approved borrow pits. All the provisions of paragraph 74, except those relating to the upstream 15 feet, covering the construction of the earth fill in the Left Ridge Dam shall apply to the construction of the earth-fill in Saddle Dam No. 8 * * *.
Paragraph 76 of the specifications entitled “Earth fill in Saddle Dam No. 5” provided as follows:
The earth-fill portion of Saddle Dam No. 5, including the fill in the cut-off trench on each side of the concrete core wall, shall consist of the natural mixture of clay, sand, and gravel from borrow pit AC-1 or from other approved borrow pits.
Paragraph 77 of the specifications entitled “Earth fills in other saddle dams” provided as follows:
The earth fill portions, including the cut-off trenches, of Saddle Dams Nos. 10 and 11 shall consist ■ of the natural mixture of clay, silt, sand, and gravel available from borrow pit CR-1, or from foundation exea- *625 vation for tbe Madden Dam, if suitable, as determined by the contracting officer, or from other approved borrow pits. The earth fill portions, including the cutoff trenches, of Saddle Dams Nos. 12 and 13 shall consist of the natural mixture of clay, sand, and gravel from borrow pit AC-1 or other approved borrow pits. The earth fill portions, including the cut-off trenches where these are required as shown on the drawings, of Saddle Dams Nos. 6, 7, 9, 14, 15, 16, and 17 shall consist of the natural mixture of clay, sand, and gravel from borrow pit CH-2 or from other approved borrow pits. [Italics supplied.]
Other provisions of the specifications having a bearing' upon this claim were as follows:
60. Stripping for embankments. — The entire areas under the Left Ridge Dam, all saddle dams and the highway embankments, and the areas of all borrow pits, or portions thereof, approved by the contracting officer for embankment materials, shall be stripped or excavated to sufficient depth to’ remove all materials not suitable, as determined by the contracting officer, for the foundation of the embankments or for constructing embankments. The unsuitable materials to be removed shall include top soil, rubbish below the ground surface not removed in clearing and grubbing, stones and other materials which might interfere with the proper compacting of the materials in the embankments, or might be otherwise objectionable. These stripped materials shall be wasted or otherwise disposed of as directed by the contracting officer. Materials' excavated in stripping will not be classified for payment. Measurement for payment for stripping will be made in excavation and will include only the stripping in locations and to the depths as directed or approved by the contracting officer. Payment for stripping, and disposal of materials wasted by stripping, as described in this paragraph will be made at the unit price per cubic yard bid in the schedule for stripping for embankments and borrow pits.
61. Plowing fowndations for embankments. — After stripping, the entire foundations, except on exposed solid rock, for the Left Ridge Dam, saddle dams and highway embankments shall be scored with a plow making open furrows not less than 8 inches deep at intervals of not more than 3 feet and running approximately parallel to the axis of the dam or embank *626 ment, the foundation of which is being plowed. _ Payment for this work will be made at the unit price per acre bid in the schedule • for plowing foundations for embankments.
Throughout the performance of the work of constructing Left Nidge Dam, Saddle Dam No. 8, and other embankments, the defendant, upon plaintiffs’ protest and otherwise, took the position that the general provisions of paragraph 69' of the specifications quoted above conferred upon the contracting officer and his duly authorized representatives full and complete discretion and authority in every instance to consider and determine whether, in his judgment, the materials from Madden Dam excavation or any source were suitable for use in Left Nidge Dam and Saddle Dam No. 8, or other embankments. Plaintiffs insisted from the beginning, and still contend, that inasmuch as paragraph 69 of the specifications was a general provision relating to embankment construction and paragraphs 74, 75, and 77 were special provisions relating directly to the earth fill in Left Nidge Dam, Saddle Dam No. 8, and other Saddle Dams in particular, these latter provisions would control if at variance with the general provisions of paragraph 69.
Defendant contends that it is impossible from the record to determine the amount of additional expense which plaintiffs incurred in performing the work, in connection with which this claim arises, in the maimer and under the circumstances which they alleged, as compared to the amount it would have cost them had they been permitted to perform during the time and in the manner in which they allege they were entitled and should have been permitted to perform the work. But from a study of the record we think the additional cost is as stated in the findings. Defendant further insists that all the actions, rulings, and decisions •of the contracting officer and his duly authorized representative were authorized by and in accordance with the contract and specifications.
With reference to the question whether plaintiffs were ready and prepared to begin making the fill for the Left Nidge Dam early in 1932 and substantially to complete it before the beginning of the rainy season in June of that *627 year if the contracting officer had acted with reasonable promptness in the premises, the record establishes that before beginning Madden Dam excavation it was necessary for plaintiffs to build a road from the top of Left Eidge at about the point where the fill thereon, to make it a dam, would end, to the site of the main dam in the gorge. This was necessary, both for the purpose of placing excavating equipment at the work and for the purpose of providing means for transporting excavated material from the .main dam. This road was commenced in December 1931 and was ready for use early in February 1932. Before beginning to make the fill on Left Eidge Dam it was necessary to have this road. It was constructed and ready for use about the time excavation was commenced on Madden Dam. It was also necessary for plaintiffs, before being permitted to' place any material in Left Eidge Dam, to have the site for that dam stripped of top soil, shrubs, etc., under the provisions of the specifications. This was commenced in December 1931 and the stripping as called for by the original specifications was completed about April 20, 1932. A part of Left Eidge Dam had been stripped and, as the matter stood at that time, was ready for fill at about the time the road was completed and ready for use in February 1932, and excavation was commenced at the site of the main dam. Plaintiffs had planned, and such plan had been submitted to the contracting officer October 23, 1931, to build Left Eidge Dam from the 1932 Madden Dam excavation. Inasmuch as the facilities and the site of Left Eidge Dam were ready early in 1932, so far as plaintiffs were concerned they were then ready to carry on the work of excavating for the main dam and to transport and place such materials in the Left Eidge Dam as contemplated and provided by the specifications. Plaintiffs were unable to do this work at that time for .the reason that they were prevented from so doing by the contracting officer. McClintic-Marshall Co. v. United States, 59 C. Cls. 817, 825-828. Although at that time, in February 1932, plaintiffs endeavored to secure the contracting officer’s permission to proceed with the placing of Madden Dam common excavation in the fill of Left Eidge Dam, the contracting officer declined to *628 give sucb approval for the reason as hereinbefore shown. He could not then come to a conclusion as to the kind of a fill he desired or whether the foundation for the Left Ridge Dam as stripped up to that time, as required by the original specifications, was satisfactory to him for the placing of the excavated material thereon. See, Levering & Garrigues Co. v. United States, 71 C. Cls. 739, 757, 758. Early in 1932 the contracting officer concluded that the upstream portions of Left Ridge Dam and Saddle Dam No. 8 must be constructed of impervious material, and early in February of that year defendant’s engineers in charge of this work informed plaintiffs that material excavated from Madden Dam and from borrow pit CR-2, if used would have to be mixed, but no instructions were given by the contracting officer or his authorized representative as to the kinds of materials desired or how they were to be mixed. The contract and specifications did not require portions of these dams to be constructed of impervious maternal and, as hereinafter stated, a board of consulting engineers from the Reclamation Bureau, the engineers of which bureau had prepared the specifications for Madden Dam and the appurtenant structures, decided that Madden Dam materials were ideal for Left Ridge Dam and should be used. However, the contracting officer did not permit it to be so constructed. The defendant was fully aware before the specifications were prepared and both parties were fully aware thereafter from the information disclosed on the original drawings with reference to the location and log of drill holes, that Madden Dam foundations to be excavated contained little, if any, clay or impervious materials. From this it is clear that the defendant and the contracting officer knew from the beginning that Madden Dam excavation, with little or no clay, would not be impervious. With this knowledge, paragraphs 74 and 75 specifically prescribed and authorized the use of Madden Dam excavation in Left Ridge Dam and Saddle Dam No. 8. The reason the original specifications did not require impervious materials in these dams was that the plans and specifications called for a concrete face on the upstream portion of the Left Ridge *629 Dam and a concrete core wall in Saddle Dam No. 8 (paragraphs 125, and 126 of the specifications) to make these dams watertight. Plaintiffs insisted that they had the right under paragraph 74 of the specifications to place the material from Madden Dam common excavation in the Left Ridge Dam without specially mixing the same with materials obtained elsewhere. At that time the contracting officer and his authorized representative not only refused to permit this to be done but they did not give instructions as to what would be acceptable. Instead it appears that the contracting officer left the matter to plaintiffs for experimentation with reference to materials placed in Left Ridge Dam and then to permit the defendant’s engineers to make tests to determine whether the materials constituted an impervious fill. We think this was a violation of the contract and that it was clearly the duty of the contracting officer, if he intended not to permit the use of Madden Dam excavation in the fill, to give clear and specific instructions with reference to the materials and the placing of same inasmuch as the specification's specifically relating to the Left Ridge Dam stated that the earth fill portions thereof “shall consist of the natural mixture of clay, silt, sand, and gravel available from the foundation excavation for the Madden Dam, from borrow pit CR-2, or from other approved borrow pits.” On April 19, 1932, plaintiffs in an attempt to bring forth some definite action or instructions from the contracting officer gave written notice that they were ready to begin making the fill for Left Ridge Dam. No instructions were forthcoming other than a letter and a drawing issued on May 23, 1932, designating permanent waste dumps for 553,000 cubic yards of common excavated material from Madden Dam, or sufficient room for all such excavation. While this letter did not in specific words order the plaintiffs to waste the 1932 Madden Dam excavation, it clearly shows beyond question that the contracting officer, acting through the construction engineer, had determined that none of this material was suitable or- would be permitted to be used in the fill for the reason that he designated the place where the materials were to be dumped as *630 “permanent waste dumps.” If he had intended the future use of any of these materials in the fill, it seems that he would have referred to the placing of same as temporary spoil banks, a term used in the specifications, rather than in “permanent waste dumps.” Plaintiffs, although they were bound by this order, did not agree with it, and on July 7, 1932, which was after the rainy season of that year had begun, again endeavored, by dumping two loads of Madden Dam common excavation on the Left Nidge fill, to have the contracting officer give instructions as to how the Left Nidge Dam was to be constructed. The material was promptly rejected but no instructions were forthcoming from the contracting officer until July 16 when he ordered, through the construction engineer, further special preparation of foundations for the fill in Left Nidge Dam in addition to the preparation of those foundations as called for in the specifications. This further delayed the commencement of the fill. No reason appears why these instructions could not have been given at least six months earlier. These were the first instructions obtained by plaintiffs as to how this dam should be constructed. These instructions were somewhat vague and were subsequently changed from time to time as plaintiffs were required to experiment with defendant’s engineers to determine how the fill should be constructed. This resulted in additional costs to plaintiffs.
On August 16, 1932, the construction engineer modified his previous decision with reference to the possibility of permitting the use of Madden Dam excavation in Left Nidge Dam and, at that time, expressed the desire that this excavation be stock piled on parts of CN-2 borrow pit material so that it could be mixed with CN-2 material. On the 19th the construction engineer made the “permanent waste dumps” previously established by him, and into which Madden Dam excavation had been wasted, temporary “stock piles for future operations.” At that time the rainy season of 1932 was on and practically all the excavation of Madden Dam foundation that could be performed in 1932, until the river was diverted in 1933, had been done. *631 It was practically impossible to reexcavate and haul during the rainy season the Madden Dam material that had been wasted as above stated.
We think it is clear that it was the fault of the defendant rather than of plaintiffs that Left Nidge Dam was not ready to be constructed in 1932 and had to be constructed in 1933 at a considerably increased cost over what it otherwise would have cost. Plaintiffs were ready and desired to proceed early in 1932, and could have if defendant had acted with reasonable diligence. But the contracting officer did not decide and did not instruct plaintiffs how the dam should be constructed and, therefore, the work was delayed to plaintiffs’ damage. Callahan Construction Co. v. United States, 47 C. Cls. 229, 233-235; Monks, et al., Executors of Arnold, v. United States, 79 C. Cls. 302, 338.
Notwithstanding the provisions of specification 74 dealing specifically with Left Nidge Dam provided that excavation from Madden Dam should be used therein, the defendant first decided that Madden Dam excavation could not be used in the fills and required it to be wasted in permanent waste dumps; second, in July it was decided that additional preparatory work was desired to be performed on the foundations before commencing the fills; third, in August it was decided that Madden Dam excavation could be used in Left Nidge Dam fill and that it might be stock piled for future use when specially mixed with other materials. We find no reason in the-record or the specifications for indecision on the part of the defendant and the delay and additional expense thus caused the plaintiffs. In October 1932, after the contracting officer in July had refused to permit Madden Dam material to be used in Left Nidge Dam, a board of consulting engineers from the Declamation Bureau, which bureau had designed these dams and written the specifications, came to the site of the work and made an investigation. As a result, this board of consulting engineers reported that “the materials encountered in the foundation excavation for Madden Dam are ideal for the Left Nidge Dam and should be used for this purpose.” In other words, the designers of the dam and the draftsmen *632 of the specifications decided that an impervious fill was not required. Notwithstanding this, Left Eidge Dam was not constructed as indicated but it was constructed of material especially blended under changed and revised plans and specifications which were not issued by the contracting officer until January 3, 1933, almost a year after plaintiffs were ready and prepared to proceed with the making of this fill.
Plaintiffs were put to considerable extra expense due to the manner in which they were required to obtain the materials for Left Eidge Dam, and especially to mix and blend the same in order to make an impervious fill which the contract drawings and specifications show was not required, and were required to excavate a second time, a considerable portion of Madden Dam excavation which had been permanently wasted, which would not have been necessary had the contracting officer acted properly and with reasonable promptness. We think this work was in addition to that required by the specifications. Plaintiffs were paid only the unit prices specified in items 5, IT, 18, and 20 of the schedule in art. 1 of the contract. Item' 5 related to common excavation for Madden Dam at $1.50 a cubic yard; item 17 related to earth fill in Left Eidge Dam at $1 a cubic yard; item 18 related to earth fill in Saddle Dam No. 8 at $1 a cubic yard; and item 20 related to earth fills in Saddle Dams Nos. 10 and 11 at $1 a cubic yard. In bidding these unit prices plaintiffs placed upon the specifications the interpretation for which they here contend and we think it a fair and reasonable one. We think the wasting of the Madden Dam common material when first excavated, the construction of the Left Eidge Dam of impervious material and the requirement of the contracting officer, in order that this might be done, that special materials be obtained from borrow pits and specially mixed and blended with reexcavated Madden Dam common or other borrow pit material were not called for by the specifications and that the contracting officer did not possess the unlimited authority to require these things to be done without compensating plaintiffs for the additional expense incurred in excess of that contemplated by the contract and the unit price bid for this work.
*633 Defendant argues that paragraph 69, entitled “Embankment construction, general,” gave the contracting officer the unqualified right to decide in every instance as to the “suitability” of all materials for construction of every embankment and that, therefore, he had the right to decide whether, in his opinion, common excavation from Madden Dam or from borrow pits was suitable material for all fills in Left Eidge and other dams. On this basis the contracting officer could have rejected all of the materials specified in paragraph 74.
Any authority granted to the contracting officer under the general provisions of paragraph 69 to decide as to the “suitability” of material was limited to those instances where the subsequent detailed specifications naming the materials the contractor could use, used the words “if suitable.” We think the proper construction of the general provisions of paragraph 69 is that the contracting officer only had authority to decide what material should be used and whether it was suitable if the numbered, paragraphs of the specifications which followed and dealt specifically, and in detail, with the fills, specifying the material to be used, contained the words “if suitable” or “if suitable as determined by the contracting officer,” or “as directed by the contracting officer.” In other words, the sentence in the general provision that “The suitability of all materials for construction of embankments shall be subject to the approval of the contracting officer” was not intended to give him that authority under subsequent specific paragraphs which specifically designated the different sources from which plaintiffs might obtain material, but which contained no provision that the materials so designated could only be used “if suitable.” There are several reasons which support this construction.
Paragraphs 74 and 75, which dealt specifically with the fills for Left Eidge Dam and Saddle Dam No. 8, stated in specific language that “The earth-fill portion of the Left Eidge Dam (Saddle Dam No. 8) shall consist of the natural mixture of clay, silt, sand, and gravel available from the foundation excavation for the Madden Dam, from borrow pit CE-2 (CE-1), or from other approved borrow pits.” The words “if suitable” are not found in this paragraph. *634 The different sources from which material might be obtained were indicated for the reason that it was not then known whether there would be sufficient material from Madden Dam excavation to make the fills for these two dams.
Paragraph 77, entitled “Earth fills in other saddle dams,” provided that Madden Dam excavation might be used if suitable. The reason for the distinction was that Left Nidge Dam and Saddle Dam No. 8 had concrete walls to make them impervious as prescribed by paragraphs 125 and 126 of the specifications. An impervious fill was therefore not necessary nor contemplated in the fill for Left Nidge Dam and Saddle Dam No. 8. The drawings so showed and the engineers of the Neclamation Bureau so determined. The other Saddle Dams specifically covered by paragraph 77 had no concrete face or core wall and, therefore, it was necessary to give the contracting officer full authority to determine as to suitability of material — that is, that he might require the use of impervious material. Paragraph 74 further specifically provided that “separation, sorting, blending, or segregation of the materials” to be placed in the fill for Left Nidge Dam and Saddle Dam No. 8 would be required only to the extent that in the case of power-shovel or equivalent methods of excavation the embankment materials should be mixed and blended only by the usual process of excavating against a vertical face or equivalent method. Plaintiffs’ method of excavating Madden Dam satisfied this requirement. Throughout the specifications there appear numbered paragraphs which contain general provisions which are followed by numerous numbered paragraphs dealing specifically with the various matters referred to in the general provision. In every instance these special provisions repeat time after time, whether the work is to be performed or the material is to be used “as directed” or “as determined by the contracting officer,” or “if suitable, as determined by the contracting officer.” Where there are two clauses in a contract in any respect conflicting, the clause which is specially directed to a particular matter controls in respect thereto over a clause which is general in its terms, although within its general terms the particular may be included. This is so for the reason that when the parties express *635 themselves in reference to a particular matter the attention is directed to that, and it must be assumed that it expresses their intent, whereas a reference to some general matter, within which the particular may be included, does not necessarily indicate that the parties had the particular matter in mind. Mutual Life Insurance Company v. Hill, 193 U. S. 551, 558; Rodgers v. United States, 36 C. Cls. 266, 278.
By requiring plaintiffs to construct the fills in the manner and of the materials hereinbefore indicated, the defendant obtained better and more expensive dams than the contract contemplated or called for, and plaintiffs are entitled to recover the reasonable and necessary extra expense established by the evidence. Wood v. Ft. Wayne, 119 U. S. 312; Anvil Mining Company v. United States, 153 U. S. 540; J. Hampton Moore, Receiver, v. United States, 46 C. Cls. 139, 173. Judgment will be entered in favor of plaintiffs for $152,061.69 on this claim.
Claim 3. $76$33.99, alleged extra cost for spillway a/pron extension. — This claim relates to certain items of work called for and required to be performed by plaintiffs under revised plans and drawings ordered in writing by the contracting officer for a 30-foot extension of the downstream concrete apron of the main dain. This change in accordance with the revised plans was ordered in writing by the engineer of maintenance as the contracting officer under art. 3 of the contract. Upon receipt of these revised plans and drawings, plaintiffs made request of the contracting officer that a change order be issued covering this work and were advised that the revised plans and the letter accompanying same constituted a change order. Thereupon plaintiffs inquired in writing as to what unit prices would apply to this work and were advised by the construction engineer, as the authorized representative of the contracting officer, that the changes were reasonable under paragraph 43 of the specifications, and therefore that the unit prices set forth in the contract for the original apron would apply. Plaintiffs protested this ruling in writing, claiming additional compensation over the unit prices for the original spillway apron for the performance of the work incident to construction of the 30-foot extension of the downstream spillway apron on the *636 ground that this was not a reasonable change under paragraph 43 but was more expensive, and asked additional payment over the unit price for such increased costs. The engineer of maintenance, acting as contracting officer under proper authority, ruled that the change ordered was a reasonable one and, on that ground, denied plaintiffs’ claim stating that under paragraph 43 of the specifications the contracting officer had no authority to pay plaintiffs any increased costs for this work. On the basis of this construction of the specifications the contracting officer did not make any determination or findings of fact, and refused to consider the matter of any adjustment or modification of the contract under arts. 3 and 15. Plaintiffs did not appeal from this decision of the contracting officer to the head of the department. Paragraph 43 of the specifications provided as follows:
Bight to- cha/nge locations and flans. — When additional information relative to foundation or other conditions becomes available as a result of the excavation work, further test drilling or otherwise, it may be found desirable to change the location, alignment, dimensions, or design of the dams, power plant, or appurtenant works, to meet such conditions.. The Government reserves the right to make such reasonable changes as, in the opinion of the contracting officer, may be considered necessary or desirable, and the contractor shall be entitled to no extra compensation because of such changes, except that any increase thereby in the amount of excavation, concrete, or other work required, will be paid for at the unit prices bid in the schedule. The contractor’s plant shall be laid out and his operations shall be conducted so as to accommodate any reasonable change in the location and design of the various works or any part thereof without additional cost to the Government.
Art. 3 of the contract referred to in the first part of this opinion prescribed the duties of the contracting officer when making changes. Art. 15 provided for the determination of facts by the contracting officer, subject to appeal by the contractor to the head of the department from such decision concerning questions of fact. Art. 5 related to “extra work” or orders. Paragraph 6 of the specifications related *637 to protest claim for work considered by the contractor to be outside of the requirements of the contract.
Three questions are presented under this claim. The first one is whether the change which added the downstream apron extension was a reasonable one such as would entitle plaintiffs to pay for such work only at the unit prices specified in the contract for the original downstream spillway apron, which was a part of the main dam. The second is whether the change called for work of such character as to call for an equitable adjustment under Art. 3 upon the basis of the determination of facts as to the necessary and unavoidable increased costs. The third one is the extra costs not contemplated by the contract to which the plaintiffs may be entitled.
It will be seen from this statement of the facts and the nature of the controversy between the parties that the matters involved required a determination of facts as well as an interpretation of the provisions of the contract and specifications. However, the contracting officer did not make any decision on the fact phase of the matter, but based his decision upon his interpretation of the applicable provisions of the contract and specifications that the change in the plans and specifications was a reasonable one and called for no payment for increased expenses in excess of the unit prices stated in the schedule under Art. 1 of the contract with reference to the work as originally called for. To that decision plaintiffs did not further protest and did not appeal from the ruling of the contracting officer to the head of the department. But Art. 15 only required an appeal from a decision of the contracting officer on questions of fact and, since the contracting officer made his decision upon an interpretation of the specifications rather, than upon the determination of facts, failure to appeal does not preclude consideration of the question here. Rust Engineering Co. v. United States, supra.
Upon the facts we are of opinion that the construction of the apron extension was a reasonable and desirable change under paragraph 43 and that plaintiffs were properly paid for all items, except item (b), for which they were entitled to be, but were not paid at the proper unit price. The work *638 of constructing the extension was paid for at the unit prices fixed for the construction of the original apron and walls. Plaintiffs’ increased costs, except items (b), (e), (g), and (h), were occasioned by the fact that their plant was not so constructed to permit the cableway for handling materials to reach beyond the original apron and walls which necessitated some rehandling. However, paragraph 43 provided that the plant should be so laid out and the operations conducted so as to accommodate any reasonable change of this kind without additional cost to the Government. Items (e) and (h) are covered by paragraph 56 of the specifications and are therefore not allowable. This paragraph provided that “The contractor shall construct and maintain all necessary cofferdams, flumes, * * * and shall install, maintain, and operate all necessary pumping and other equipment for unwatering the various sites of the work. * * * The cost of all work described in this paragraph shall be included in the lump-sum price bid in the schedule [$50,000] for diversion and care of river during construction and unwatering foundations, and no increase in this price will be allowed on account of any extra work or change in the location or designs of the dams, or other works, ordered under the contract.” The proof does not establish that item (g) flood damage would have been avoided if this change had not been made. Paragraph 56 made plaintiffs responsible for this flood damage. Since this was a reasonable change this item would not be recoverable in any event. Under item (b) plaintiffs are entitled to recover $1,372.67 balance due for excavation of a cut-off trench, under the apron extension change order. This was paid for as Madden Dam rock excavation when, it should have been paid for at the unit price of $10 a cubic yard for “excavation for cut-off trenches.”
Plaintiffs are entitled to recover $1,372.67 under this claim and judgment will accordingly be entered.
Claim 4. $17,677:65, alleged to be due under paragraph 78 of the specifications for obtaining and placing earth fills for highways. — The solution of this claim involves the application of the facts to the provisions of paragraph 78 of the specifications. The facts have been set forth in the findings *639 under f,his claim. This paragraph, which is also set forth in the findings, provided that the earth fills for both the main and branch highways, where these were not located on dams, should be constructed from required excavation for the highways at unit price, item 11, “common excavation for highways, $1.50 a cubic yard”; unit price, item 12, “rock excavation for highways, $2.50 a ’cubic yard” where the excavated materials are suitable: Provided, That the contractor should “not be required to use such excavated material when it is located on the opposite side of the river from the fill being-constructed.” This paragraph further provided that “Due to the disintegrating tendencies of the rock, in the excavation for the highways and in other required excavation in the vicinity of the highways, no highway fill shall contain any of this rock in an amount in excess of 85 per cent of the total volume of materials in the fill unless otherwise directed by the contracting officer.” The contracting officer did not otherwise direct. The paragraph further provided that if there should not be sufficient suitable material available “from required excavation for the highways, additional materials shall be secured from other required excavation or from borrow pits approved by the contracting officer. Except as otherwise provided for materials on the opposite side of the river, the contractor shall move all required materials to the highway fills regardless of the length of haul.” It also provided that the cost of constructing the earth fills for the highways, including the hauling of materials regardless of length of haul, and doing all work described in that article “shall be included in the unit prices per cubic yard bid in the schedule for excavation for highways or for other required excavation : Provided, That payment for excavating the materials used in these fills from approved borrow pits, if such materials are required, as determined by the contracting officer, will be made at the unit price per cubic yard bid in the schedule for common excavation for highways, in which case the materials will be measured for payment in excavation in the borrow pits.”
Plaintiffs original plan was to use the required excavation from Madden Dam with which to construct this highway fill and to begin -work thereon the latter part of August 1932 *640 and, in the event the amount of material immediately and conveniently available was not sufficient to complete the proposed fill, to complete it during the next dry season in 1933 when the main channel excavation for Madden Dam would be open. Nothing was said in plaintiffs’ letter to the construction engineer about extra payment for making this fill because it was not then known that the material would have to be secured from borrow pits or wasted Madden Dam common excavation on the opposite side of the river. August 19, the construction engineer wrote plaintiffs agreeing to their proposition. For some reason not clearly shown by the record, the work was not carried on as planned and the highway fill was not made until the spring of 1933. At the beginning of 1933 there was a considerable amount of Madden Dam common excavation which had not been excavated which was suitable for use in this highway fill. However, plaintiffs had to use this Madden Dam common excavation in the construction of Saddle Dam No. 8 referred to in Claim 2. Consequently there was no material available from Madden Dam or other required excavation for the highway fill and it was necessary for plaintiffs and they were therefore required to obtain the necessary material for making this highway fill from approved borrow pit CR-2 and from Madden Dam waste pile, both of which were on the opposite side of the river. The only approved borrow pits from which plaintiffs could obtain material were on the opposite side of the river'from this highway fill. There were no borrow pits available on the side of the river where the site of the fill was located. In order to reach the fill from the only source of supply, it was necessary for plaintiffs to build, and they did construct a temporary bridge across the river.
The defense to this claim is that the contracting officer did not order plaintiffs to obtain the material, or any portion thereof, for this highway fill from a borrow pit or from the Madden Dam waste pile, but that he simply agreed with plaintiffs’ proposal, made in 1932, to construct this highway fill from Madden Dam excavation. But we think in the circumstances that it was not necessary, in order for plaintiffs to become entitled to pay for the excavation necessary to be *641 made from a borrow pit and Madden Dam waste pile to obtain material with which to construct this fill, for them to be “ordered” to use this material. The contracting officer knew what was being done and consented. The facts establish that, except as to the 4,353 cubic yards of material obtained from Madden Dam waste pile, there was no required excavation material available which was suitable for the construction of this fill; that plaintiffs were, of necessity, compelled to obtain 7,432.1 cubic yards of material from an approved borrow pit in order to. construct this fill. We think a proper interpretation of paragraph 78 is that plaintiffs could not be required by the contracting officer, without payment, to remove material for this fill from the opposite side of the river whether it was secured from “required excavation for highways” or “from borrow pits or other required excavation,” and since it was necessary to excavate and remove the material from borrow pits on the opposite side of the river plaintiffs are entitled to payment therefor as provided in this paragraph. There were no approved borrow pits or any other source of obtaining suitable material on the same side of the river as the fill. The contracting officer held and defendant here contends that plaintiffs cannot recover because the prohibition in paragraph 78 against plaintiffs being required to transport material from the opposite side of the river applied only to “required excavation for highways” and plaintiffs did not transport such material across the river. But this construction gives effect to only part of the provisions of paragraph 78.
It will be seen from the above reference to paragraph 78 that the first sentence with reference to material that could be used and with reference to its transportation across the river concerned “excavation for highways” but later on the specification provided for the use of material from approved borrow pits or other required excavation if there was not sufficient suitable material available from required excavation for highways. There was not such suitable material. Following this provision the specification again made an exception with reference to material on the opposite side of the river, stating that “Except as otherwise provided for materials on the opposite side of the river, *642 the contractor shall move all required materials to the highway fills regardless of length of haul.” By this exception which immediately followed the provisions with reference to the use of materials from borrow pits or other required excavation, other than “excavation for highways,” the paragraph made the proviso applicable also to the materials last mentioned, and we think it was clearly so intended for no reason can be perceived why the prohibition should apply to “excavation for highways” on the opposite side of the river and not to necessary borrow pit excavation also on the opposite side of the river from the fill being made.
The amount to which plaintiffs are entitled in the circumstances for the material excavated from the borrow pit for use in this fill under paragraph 78 of the specifications (7432.1 cubic yards at $1.50 a cubic yard) was $11,148.15. Judgment will accordingly be entered for this amount.
Claim 5. $21,617.70 for rock excavation for Madden Dam cut-of trenches; unit price item 7 of the schedule. — Art. 1 of the contract provides for payment at $10 a cubic yard for “rock excavation of cut-off trenches for Madden Dam.” Paragraph 29 of the specifications contains a general description of Madden Dam and, among other things, states that “Excavation for the base of the dam will be carried well into solid rock, and a cut-off trench will be excavated below the upstream heel.” Paragraph 65 of the specifications, entitled “Excavation of Madden Dam cut-off trenches,” deals specifically with this item of work and specifies the basis of measurement for the purpose of payment as follows :
Cut-off trenches shall be excavated under the upstream toe of the Madden Dam, the upstream edge of the upstream concrete aprons, under the downstream edge of the spillway apron, and under the downstream edge of the tailrace floor. The provisions of paragraph 63 relating to care in excavation, and the provisions of paragraph 64 relating to cavities caused by careless excavation, shall apply in the excavation of these trenches. Excavation of the cut-off trenches covered by this paragraph will be measured for payment to the actual excavated lines, as approved by the contracting officer, below the general level of the adjacent completed excavated surfaces, and payment therefor will be made at the unit price bid in the schedule for. rock excavation of cut-off trenches for Madden Dam.
*643 The facts show that the trench at the upstream heel of the dam was between the completed exacavated surface for the upstream apron and the .completed excavated surface for Madden Dam foundation; that the surface of the upstream apron was in most cases higher than the surface of the completed excavated surface for Madden Dam foundation. The trench at the downstream toe was between the excavated surface for the spillway apron extension and the completed excavated surface for the concrete apron below the spillway; the excavated surface for the apron below the spillway was higher than the excavated surface for the spillway apron extension. In other words, the completed excavated surfaces adjacent to the cut-off trench at the upstream heel' were not on the same level, and the same is true of the cut-off trench at the downstream toe. We think it is clear that the provision of par. 65 requiring that the excavation of the cut-off trenches be measured for payment to the actual excavated lines below the general level of the adjacent completed excavated surfaces meant and could only mean a line projecting from one surface to the other and that the contracting officer and the head of the department clearly misconstrued the contract when they measured the excavation for the cut-off trenches by projecting a horizontal line through the intersection of the excavation line for the base of the dam, with the line of the downstream face of the cut-off trench excavation. In each instance the contracting officer measured the excavation for purposes of payment at the contract price a cubic yard below the lowest adjacent surface which left 3,133 cubic yards of rock within the line of the cut-off trenches between the two surfaces which plaintiffs were required under the contract to excavate as a part of the cut-off trench, for which the defendant did not pay them. The contract price for this yardage was $21,617.10, which plaintiffs are clearly entitled to recover.
Defendant contends that the only material for which plaintiffs can be paid, as for cut-off trenches, must be in that portion of such cut-off trenches as is under the upstream heel of Madden Dam and under the downstream toe, and that payment claimed by plaintiffs for the triangular portion of the cross section which plaintiffs had to excavate *644 ás a part of the cut-off trenches cannot be made because it was not under but above the upstream heel of the dam and under the downstream edge of the spillway apron. The word “under” as used in the specifications clearly had reference to the trench as a whole, which certainly was under and not above these surfaces. The basis of payment specified in the contract was that the rock necessary to be excavated by hand to provide for these trenches should be measured for payment below the general level of the adjacent completed surfaces and not, as the 'defendant contends, below the lowest adjacent surface.
Judgment will be entered for $21,617.10 on this claim.
Claim 6. $%5,995.66 for slop$ payment, common excavation. — Plaintiffs were paid at the unit price for the common excavation specified in the contract on the basis of a slope of 1 to 1 and a 1-foot berm for common excavation and % to 1 for rock excavation. Plaintiffs duly protested and appealed, and claimed pay at the contract unit price under paragraph 62 of the specifications on the basis of a claimed practicable slope of 2 to 1 and a 10-foot berm as necessary for common excavation because it was necessary to have this slope and berm in order to avoid cave-ins, danger to workmen, and to permit progress of the work. The contracting officer and head of the department refused to stake out a practical slope and berm for common excavation and when they considered and decided plaintiffs’ protest, appeal, and claim for payment, they gave no consideration whatever to the matter whether a slope of 1 to 1 and a 1-foot berm would stand or was practicable, holding that they were bound to pay only on the basis of a slope of 1 to 1 and a 1-foot berm. We think these decisions were erroneous. The contracting officer and the head of the department admitted that the common material would not stand on a 1-to-l slope. Paragraph 62 of the specifications provided as follows:
Except as otherwise provided for definite features of excavation in these specifications or shown on the drawings, excavation will be measured for payment to slopes of 1 to 1 for common excavation and 14 to 1 f°r rock excavation, and in the case of excavation for structures, to lateral dimensions 1 foot outside of the foundations *645 of the structure; * * * And provided further, That for any structure or open cut where, in the opinion of the contracting officer, the conditions warrant, the excavation will be measured for payment to the most practicable dimensions and lines as staked out or otherwise established by the contracting officer. * * *
The original contract drawings for upstream common excavation showed a slope of 1 to 1 and a 1-foot berm and the same drawings showed the slope and berm for pay purposes at the toe of the spillway apron of 3 to 1 with a 23-foot berm. When the spillway apron extension was added, this drawing for the downstream excavation was revised but it still showed a 3-to-l slope and a "berm of about 23 feet. Later the contracting officer further revised this revised drawing and changed the pay lines for common excavation to a 1-to-l slope and a 1-foot berm. The material encountered, both upstream and downstream at the toe of the spillway apron as extended was the same- and would not stand on a 1-to-l slope. A berm of only 1 foot was not practical and was dangerous to workmen, in that it did not give’ sufficient room between the bottom of the common excavation and the deep rock excavation below. A 2-to-l slope and a 10-foot berm was practical and, in excavating to such slope and berm, plaintiffs were required to excavate 17,330.37 cubic yards of common excavation, the difference between an impractical slope measured 1 to 1 with a 1-foot berm and a practical slope of 2 to 1 with a 10-foot berm. We think plaintiffs were' and are entitled to be paid for this excavation at the contract rate of $1.50 a cubic yard, or $25,995.56. Paragraph 62 above quoted did not specifically require payment in all events on the basis of a slope of 1 to 1 with a 1-foot berm for common excavation, but only in the event (1) that the contract drawings did not show otherwise and (2) in the event that such slopes were found not to be practical when the work was being done, in which later event it was the clear duty of the contracting officer to stake out the slope and berm to which the excavation should be made as a practicable matter and to measure the excavation for payment under the most practicable dimensions. The contracting officer refused to per *646 form bis duty in tbe premises, and it becomes tbe duty of tbe court to determine tbe matter upon tbe evidence. Newport Contracting & Engineering Co. v. United States, 57 C. Cls. 581, 586, 587. Not only this, tbe contracting officer changed tbe original contract drawings which showed a slope of 3 to 1 and a 23-foot berm as the pay line for tbe excavation at the toe of tbe spillway apron to a slope of 1 to 1 and a 1-foot berm which was correctly shown by the evidence and was known by the contracting officer at the time to be an impractical slope and bprm. Plaintiffs are entitled to recover the amount claimed at the contract rate for the material which they were required to excavate to the practical dimensions of 2 to 1 and a 10-foot berm.
Claim 7. $4-,901.07 alleged to he due hy and collected from plaintiffs hy the defendant for cement alleged to have heen wasted. — The only question involved in this claim is whether under the facts set forth in the findings and the proper interpretation of paragraph 101 of the specifications the plaintiffs should have been charged with any sum on account of the small amount of cement wasted under the circumstances disclosed by the record. We think it is clear that the charge was unwarranted and unauthorized. In the first place the record clearly establishes that no cement was wasted because of any carelessness on the part of plaintiffs and. that the amount of the cement wasted was far less than the normal, anticipated, and expected wastage on a project of the magnitude of Madden Dam. The defendant’s expert engineer of long experience in concrete work of this character, who was in direct charge of all the concrete work on this project, so testified. His testimony is supported by other competent evidence and is not refuted by the defendant’s evidence.
In the second place paragraph 101 of the specifications when properly interpreted contemplated and recognized that in a project of this magnitude there would obviously be some wastage; of cement. For that reason the specifications provided that plaintiffs would be charged with any cement that was damaged or wasted “due to carelessness” by plaintiffs. The evidence shows beyond doubt that none of the cement with which plaintiffs were charged was wasted as *647 a result' of any carelessness on tbe part of plaintiffs or its employees. The plaintiffs cannot be charged for any cement lost or wasted because of compliance by plaintiffs’ employees with instructions of the defendant’s authorized inspectors. Moore v. United States, 46 Ct. Cls. 139, 172. In the third place plaintiffs could not under the specifications be charged with and required to pay the defendant for 1,924.295 barrels of cement which represented the amount lost on the entire project, for the reason that this amount of cement was far less than the 2,483.99 barrels which the defendant received from the manufacturer, for which the defendant did not pay. This last-mentioned amount of cement which the defendant received in excess of the number of barrels bought and paid for resulted from the manufacturer placing in each bag a pound or two extra in order that no bag should subsequently be found to be underweight. Paragraph 101 of the specifications provided that the contractor should be charged in case of negligence but that the charge should only be for the “cost to the Government” of the amount of cement wasted. Since the Government received the full benefit in the work of the entire amount of cement for which it paid, plaintiffs cannot be made to pay the Government a profit on the cement which was unavoidably wasted, but which was received by the Government without cost.
Judgment will therefore be entered for $4,901.07 on this claim.
Claim 8. Payment for concrete placed in test pits. — The only question involved in this claim is the construction of extra work order No. 2 of January 13, 1933, in the light of the evidence as to the agreement between the parties as a result of which this extra work order was issued. Extra work order No. 2 is set forth .in the findings under this claim. Unit of work item No. 54 in art. 1 of the contract provided for payment for the “concrete in counterforted wall” at $20 a cubic yard. A test pit was necessary and under an “extra work order” was excavated in the foundation of this wall which, as a part of the counterforted wall, had to be filled with concrete. For this work, about which there is no dispute, plaintiffs were entitled under item 54 and paragraph 124 of the specifications to payment for the com *648 Crete placed in this test pit in constructing the counter-forted wall at the rate of $20 a cubic yard. Paragraph 124 provided that this item of the schedule, “Concrete in coun-terforted wall, includes all concrete in the counterforted retaining wall at the right abutment of the Left Eidge Dam. Concrete in the counterforted wall shall be placed in horizontal layers not exceeding 5 feet in thickness.” The defendant’s construction engineer proposed to plaintiffs that the concrete placed in the test pit under the cojmterforted wall, which under the contract was a part of such wall, be paid for by the defendant at a unit price of less than $20 a cubic yard. The work of properly cleaning and preparing open pits and wells for the placing of concrete therein is more difficult and expensive, and more care is required than in placing mass concrete on ordinary foundations. To the proposal of the construction engineer, plaintiffs expressed a willingness to agree to a reduction of the unit price of $20 a cubic yard for placing concrete in the test pit in the counterforted wall if the change order would be made to apply to all open pits, test wells, and other depressions where such open pits and test wells were required by the defendant. The construction engineer proposed a unit price of $7.50 a cubic yard for concrete filling in open pits, test wells, and other depressions, which price, instead of the unit price of $20, would apply to the test pit under the counterforted wall then under consideration. Plaintiffs agi’eed with this understanding, that the unit price would apply to all test pits and wells where required and directed by the defendant. Subsequent to the making of this extra work order No. 2, the contracting officer directed, and required as extra work, the excavation of certain test pits in the foundation of Madden Dam, but when the time came for payment for the placing of concrete in these test pits the contracting officer refused to pay the unit price of $7.50 specified in extra work order No. 2 and paid for the placing of such concrete at $2.50 under unit work item No. 48, in art. 1 of the contract, as for “Concrete in Madden Dam.” The work and care necessary to place the concrete in these tests pits were exactly the same as that of placing concrete in' the test pit under the counterforted wall. Extra work *649 order No. 2 was tbe result of an agreement without which the contracting officer was without authority under the contract to reduce the contract price from $20 for the concrete placed in the test pit in the foundation of the counterforted wall to $7.50. In the light of the language of the extra work order and the unrefuted testimony as to the basis of plaintiffs’ agreement to the terms thereof, there can bé no doubt under the plain language of the order, the substance and extent of which are contained in the first two paragraphs thereof, as to the right of plaintiffs to be paid for the concrete placed in the test pits excavated under the foundation of Madden Dam at the rate of $7.50 a cubic yard. These two paragraphs of the change order are as follows:
In accordance with Article 3 of your contract PC'lp-201, dated September 14, 1931, you are hereby directed to place Concrete Filling in Open Pits, Test Wells, and other Depressions where required and directed by the contracting officer and where the concrete is not of any class or in any situation covered by any other concrete item in the schedule.
This will be added to the schedule as “Item No. 97, Concrete Filling In Open Pits, Wells, Etc.,” unit price seven dollars and fifty cents ($7.50) per cubic yard.
Under this language the order and the unit price stated therein cannot be limited only to the test pit excavated for the counterforted wall. The last paragraph of the order quoted in the findings, which relates only to the filling of the test pit in the counterforted wall then under consideration, cannot be interpreted so as to limit the price of $7.50 to the filling of such test pit in the counterforted wall. The amount to which plaintiffs are entitled for placing the concrete in other test pits required and directed by the contracting officer at $7.50 a cubic yard is $1,284. Judgment will be entered in favor of plaintiffs in this amount.
Claim 9. $7£3%<8%, for extra rook excavation. — The facts with reference to this claim are set forth in the findings. It is sufficient here to state that the amount represents the cost of certain rock excavation by hand, due to unforeseen conditions which were encountered, in excess of the rate of $3.10 a cubic yard for general rock excavation. Plaintiffs *650 and the contracting officer, and also the head of the department, agreed that the extra expense of this excavation was $2.18 a cubic yard in excess of the contract rate of $8.10 and that, because of the manner in which the work had to be performed due to unforeseen conditions encountered, plaintiffs should be paid such excess cost. The head of the department submitted the matter to the Comptroller General for authority to make payment and the Comptroller General concluded that plaintiffs were not entitled to any extra payment and refused to authorize the contracting officer to proceed. The contracting officer and not the Comptroller General was the one who had authority to decide whether plaintiffs were entitled under the circumstances to this extra cost. Judgment will be entered in favor of plaintiffs for $7,532.34.
Claim 10. for fA0J¡J¡. cubic yards of concrete in upstream, aprons in excess of the amownt for which plaintiffs were paid. — The facts and pertinent provisions of the specifications with reference to this claim are set forth thereunder in the findings. Upon those facts plaintiffs are entitled to recover. The contracting officer simply failed to comply with paragraph 123 of the specifications in making his measurements for payment of the concrete placed in the upstream aprons. The contract provided for the placing of concrete in aprons on the right and left abutments on the upstream side of Madden Dam. Before such concrete was placed, the rock was excavated to the lines and grades as directed by defendant. The finished surface of the rock was irregular caused by the removal of rotten and weather-beaten rock in order to obtain a solid foundation. This left the surface of the foundations rough and with deep holes at certain points. The defendant approved and accepted this surface as so provided, and in these circumstances if plaintiffs had made further excavation for the purpose of providing a more uniform surface it would not have been paid therefor.
Anchor bars were placed at heights as directed by the defendant to the tops of which were fastened reinforcing mats as directed and concrete was placed so as to come three *651 inches above the reinforcing mats. All space below a point three inches above the mats had to be filled with concrete, and in measuring for payment the contracting officer did not give proper consideration to the depressions in the surface of the foundation on which the concrete was placed in determining, as he construed paragraph 123, the average thickness for such purpose. The provision in paragraph 123 of the specifications that “If the open-cut excavation upon or against which the concrete is to be placed is made to greater dimensions than necessary for placing the prescribed average thicknesses of concrete, the excess spaces shall be solidly filled with concrete” and that the entire expense of such filling shall be borne by the contractor, except that no charge should be made for cement, did not justify the contracting officer in not taking into consideration the holes or depressions, since the defendant approved and accepted the excavation as made, which was necessary to provide a proper foundation and defendant also controlled the actual thickness of the concrete by fixing the heights of the anchor bars and mats. If it be regarded that in this instance the contracting officer made any decision of facts, his decision was arbitrary and so grossly erroneous as to imply bad faith.
Judgment will be entered in favor of plaintiffs for $2,104.40 for the 210.44 cubic yards of material placed in excess of the amount for which payment was made.
Claim 11. $1,800.80 for drilling grout holes through concrete which entered and hardened in certain grout pipes.— Upon the facts disclosed by the record and set forth in the findings, we are of opinion that plaintiffs are entitled to recover on this claim. The contracting officer and the head of the department denied the claim on their construction of paragraph 89 of the specifications. We think their interpretation was erroneous and unjustified. They construed the specifications more favorably to the defendant and strictly against plaintiffs in violation of the rule mentioned in the first part of this opinion. They based their decision against plaintiffs on the provisions of paragraph 89 which provided that “Each hole [after the, pipe is *652 placed] shall be protected from becoming clogged or obstructed by being suitably capped or otherwise protected until it is grouted and any hole becoming obstructed before it is grouted shall be opened up to the satisfaction of the contracting officer by and at the expense of the contractor.” They construed this as requiring plaintiffs to open up the pipes at their own expense, notwithstanding the pipes had been suitably capped and otherwise protected from becoming clogged or obstructed from any source other than from grout forced into other pipes as directed by the defendant. The defendant did not permit plaintiffs to drill all the grout holes before the grouting was done and did not permit plaintiffs to grout the holes at the same time. As a result, certain of the pipes in which the grout holes had not been drilled became filled with grout from the seams in the rock underneath when other pipes and drilled holes were grouted. The drilling of holes through hardened grout in the pipes in which holes had not been drilled prior to the time the grout from other holes had found its way into such pipes was just as expensive and difficult and required as much time and effort as the drilling of the holes in the rock beneath the pipes. In our opinion the language of paragraph 89 meant only that plaintiffs should be required at their own expense to open up the grout pipes if they should become obstructed or clogged from the top because not suitably capped or the opening otherwise protected. We. think this is clear enough from an unbiased reading of the specification which plainly states that the hole through the pipe, if drilled, or the pipe, if the hole in the rock has not been drilled, shall be protected from becoming obstructed by being suitably capped. A reading of paragraphs 91, 93, and 139 of the specifications supports this construction of paragraph 89. The grout pipes were required to be firmly and securely set three inches in the rock before the mass concrete was placed around them and before the grout holes in the rock beneath should be drilled. It was not plaintiffs’ fault that certain pipes became obstructed by grout and that such grout hardened therein before it was discovered. This resulted from the manner in which the defendant required plaintiffs to drill the grout holes and inject the grout.
*653 Judgment will be entered in favor of plaintiffs for $1,200.80 as claimed.
Claim 12. $600 for smoothing bituminous enamel applied to sluiceways. — The amount of this claim represents extra and unnecessary costs incurred by plaintiffs in performing certain extra work under this claim, as set forth in the findings, as a result of hot bituminous enamel being applied to the metal lining of the sluiceways in the manner directed by the defendant, over the objection of plaintiffs. Plaintiffs suggested and asked permission of defendant’s authorized inspector to have this hot bituminous enamel applied from the top down, but they were directed to apply it from the bottom up, which was done, with the result that certain of the hot material when applied ran down over the lower surface to which such enamel had been applied; this resulted in the surface to which the enamel had been applied in such manner being rough when the application had been completed. Thereupon the contracting officer required plaintiffs to smooth the surface by the use of hot irons, to which plaintiffs objected unless paid for the additional cost of so doing. The contracting officer refused to issue an extra work order and ordered plaintiffs to perform the work, which they did. Sollitt & Sons Co. v. United States, 80 C. Cls. 798, 808, 809. They duly protested and made claim for the increased expense of $600 which was denied by the contracting officer and the head of the department bn the ground that plaintiffs were required to perform the work to the satisfaction of the contracting officer. In these circumstances we think it is clear that plaintiffs are entitled to recover, and judgment will be entered in their favor for $600.
Claim 13. $1,768.38, bdlam.ee alleged to be d/m under unit-price item 68 for installing sluicegate cylinders. — Upon the facts disclosed by the record and set forth in the findings, the plaintiffs are not entitled to recover on this claim. The specifications and drawings properly interpreted make it clear that the hydraulically operated cylinders, for which plaintiffs were paid at 1% cents a pound and for which they claim payment at 10 cents a pound, were a part of the “High-pressure, hydraulically operated gates” mentioned in paragraph 142 of the specifications rather than the “Con *654 trol apparatus for high-pressure gates” mentioned in paragraph 143. Plaintiffs were properly paid, and nothing further is due.
Claim 14. $%J¡9.68, alleged excessive* charge for cement fwmished Toy the defendant from the Panama Gandí warehouse. — In view of the facts and circumstances disclosed by the record and set forth in the findings, we are of opinion that the defendant was in error in making this charge against plaintiffs. It was as much to the advantage of the defendant as to plaintiffs to have the work progress as rapidly as possible. It was for the benefit of defendant that a time limit was placed upon the completion of the work. Unanticipated. circumstances resulted in the defendant furnishing plaintiffs with certain cement which it had in its warehouse at the Panama Canal, by reason of the fact that plaintiffs had used all the cement which they had received in the last shipment. Paragraph 40 of the specifications provided that the defendant would furnish the cement necessary for construction of the work called for and there is nothing in the contract which provides that such cement would be furnished by the defendant from its warehouse or otherwise. There is no provision in the contract that if the defendant furnished cement from its warehouse that plaintiffs would be subject to a warehouse charge therefor, and we find no basis in the contract or specifications for any implied agreement to this effect. Plaintiffs did not agree to the imposition of such a charge, and if the defendant did. not desire to supply this cement under the circumstances it was at liberty .to wait until the next shipment arrived. It elected to furnish the necessary cement to permit the work to proceed. The specifications, when reasonably and properly interpreted, authorized and permitted it to supply the cement in the manner described without making any charge against plaintiffs therefor. In fact, we are of opinion that the contracting officer was without authority to impose such charge.
Judgment will be entered in favor of plaintiffs on this claim for $249.62.
Claim 15. $367.97 for extra costs occasioned by extra work required by a change ordered in the construction of a parapet *655 wall for Saddle Bam No. 8. — The original contract drawings for this wall and the specifications applicable thereto show a monolithic wall; and upon that basis plaintiffs made their bid. The cost of constructing such a concrete wall was less expensive than one of frequent construction joints, and this is admitted. Before the work was performed the contracting-officer by written order changed the construction of the wall as called for by the contract and required that it be made with construction joints at intervals of 15% feet which increased the amount of work necessary to be performed and the expense of constructing such a wall over what it would have cost to construct it as originally called for in accordance with the contract. Although plaintiffs did not protest within ten days after the change was ordered, their protest and claim made August 21,1933, were considered and decided by the contracting officer and the head of the department on the merits. This operated as a waiver of the provision that such protest should be made within ten days, unless the time should be extended by the contracting officer. Charles Thompson et al. v. United States, ante, p. 166. The contracting officer refused to consider and make an equitable adjustment, as required by art. 3 of the contract, but held that the change ordered was justified and authorized by paragraph 43 of the specifications. As hereinbefore pointed out in the first part of this opinion, articles 3, 5, and 15 of the contract and paragraph 43 of the specifications must be considered and construed together. When so considered it is clear that paragraph 43 of the specifications did not confer upon the contracting officer the broad authority, which he claimed, to make changes in units of work which produced and required additional work and costs in excess of the work and costs contemplated, required, and called for by the contract and specifications as made. This was not an increase in or an addition to the amount of a unit of work, but was a change in the work as called for. Paragraph 43 contemplated only that when additional information should be obtained subsequent to the making of a contract it might be found desirable to change the location, alignment, dimensions, or design of the dams, power plant, or appurtenant *656 works, to meet such conditions, and that reasonable changes could be made to this end without the contractor becoming entitled to extra compensation by reason thereof, “except that any increase thereby in the amount of excavation, concrete, or other work required, will be paid for at the unit prices bid in the schedule” (art. 1). But reasonable changes in the location, alignment, dimensions, or design of dams, power plant, or appurtenant works which might result in an increase or decrease of quantity of work as originally specified and called for, and to be performed and paid for in accordance with the specific requirements of the contract and specifications at the unit prices therein specified, are quite different from changes in the work as called for by the drawings and specifications of the contract which cause extra work and increased expense in performing the unit of work called for and specifically shown on the drawings and described in detail in the specifications at the same unit price bid and agreed upon for the work prior to such change. A reading of paragraph 43 shows that this was the scope and purpose of its intent. It provides as follows:
Bight to change locations and, flans. — When additional information relative to foundation or other conditions becomes available as a result of the excavation work, further test drilling or otherwise, it may be found desirable to change the location, alignment, dimensions, or design of dams, power plant, or appurtenant works, to meet such conditions. The Government reserves the right to make such reasonable changes as, in the opinion of the contracting officer, may be considered necessary or desirable, and the contractor shall be entitled to no extra compensation because of such changes, except that any increase thereby in the amount of excavation, concrete, or other work required, will be paid for at the unit prices bid in the schedule. The contractor’s plant shall be laid out and his operations shall be conducted so as to accommodate any reasonable change in the location and design of the various works or any part thereof without additional cost to the Government.
When the above specification is interpreted in the light of art. 3 of the contract, which provided that the contracting officer might make changes in the drawings or specifications *657 of the contract, but that if such changes caused an increase or decrease in the amount due under the contract or in the time required for its performance an equitable adjustment in the amount to be paid to the contractor by reason of such changes should be made and the contract should be modified in writing accordingly, it becomes clear that it was the duty of the contracting officer, when the plaintiffs submitted proof that the changes resulted in work and expense in excess of that necessary and required, if the change had not been made, to make an equitable adjustment and make reasonable compensation to plaintiffs by reason of such excess work and costs. The construction of paragraph 43 by the contracting officer and the head of the department, and the authority assumed thereunder, ignored the requirements of articles 3, 5, and 15 of the contract. It was for this reason that many of the claims involved in this suit- arose. The contracting officer could not preclude the right of plaintiffs to compensation for extra expense incurred by reason of changes ordered, by failure to perform his duty as required by these provisions of the contract. The amount due under the contract as originally made was the unit price bid and accepted for the units of work as specified. Any change made and ordered by the contracting officer which made that unit of work more expensive than it would otherwise have been, had the contractor been permitted to perform it as originally called for, was an increase “in the amount due under this contract” within the meaning of art. 3 for which the contracting officer was required to make an equitable adjustment. The evidence shows that the increased cost to plaintiffs of performing the work made necessary- by the change orders in excess of what it would have cost to perform this unit of work as originally specified was $367.97. Judgment will be entered in favor of plaintiffs for this amount.
Claim 16. $8,66335, alleged to be due for the installation of fen atocles, outlet fifes, and butterfly valves. — The installation of the equipment, which is the subject matter of this claim, was necessary for the operation of the powerhouse. The contracting officer made a written change in the *658 contract drawings which, also operated to change the specifications with reference to installation of this equipment. This change increased the cost of installation of the pen stocks, outlet pipes, and butterfly valves by $910.88 in excess of what it would have cost plaintiffs to install such equipment as originally called for, and it also changed the material in the equipment to be installed so as to reduce the weight thereof by 887,621 pounds which resulted in .the reduction of plaintiffs’ compensation under unit-price items 69 and 71 by two cents for each pound, by which the weight of the material in the equipment was reduced. Plaintiffs protested and made claim for the increased cost of installation and for an equitable adjustment under the contract, by reason of reduction in weight of the material in the equipment required to be installed. The written protest and claim were not made by plaintiffs within ten days after the change which resulted in the claim was made, but such protest and claim were considered and decided by the contracting officer and the head of the department on the merits. See Charles Thompson el al v. United States, supra. The contracting officer and the head of the department denied the claim on the basis of their construction of the contract and par. 43 of the specifications which they thought authorized the changes ordered without additional compensation. They did not make any findings of fact as to the increased cost or the amount which would be equitably due by reason of the reduction in weight of material to be installed. The contracting officer also held that the claim was not allowable in any amount because of the provisions of paragraphs 2 and 134 of the specifications. In our opinion the last-mentioned paragraphs of the specifications have no bearing upon the question here involved. Paragraph 2 states that “The quantities noted in the schedule are approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative.” And paragraph 134 provides that “The weights of metal and other parts, the handling and placing of which is to be paid for on the basis of weight, will be determined by the contracting officer. The weights of these items given in the schedule are advance estimates for the purpose of comparing *659 bids only, and tlie actual weights may vary widely therefrom.” These paragraphs were intended to prevent any misunderstanding as to the estimated total quantities for the purpose of comparing bids, as indicated by the estimates in the schedule under art. 1 of the contract with reference to each unit of work which would be required to be performed. Plaintiffs’ protest and claim were not and are not now based upon the estimated weight of the material involved as stated in the schedule; but, on the other hand, the protest and claim were and are based upon the installation of equipment as called for by the drawings and specifications and of the weight of such equipment •as shown on the original contract drawings. The revised drawings would not have been necessary if the contract drawings had not shown and described the material to be installed in accordance with the specifications. The revised drawings, together with the letter with which they were transmitted, were changes by the contracting officer within the meaning of art. 3 of the contract. Paragraphs 2 and 134 of the specifications cannot be construed as modifying the definite provisions of the contract drawings and other specifications. Under the provisions of art. 3 of the contract, plaintiffs were entitled to an equitable adjustment which the contracting officer failed to make. Six Companies, Inc., a Corporation, v. United States, 85 C. Cls. 687, 693-698.
Upon the evidence of record we have found that, on the basis of an equitable adjustment by reason of the changes, plaintiffs are entitled to recover $8,663.25. Judgment will be entered accordingly.
Claim 17. $29,3.07 for installation of drain pipes under the upstream apron from block No. 11, Madden Dam. — The facts with reference to this claim are set forth thereunder in the findings and they show that plaintiffs are not entitled to recover. The drain pipes were not installed as the result of directions or orders of the contracting officer, but they were installed by plaintiffs for their convenience with the acquiescence of the construction engineer.
Claim 18. $477.69 for certain excavation which plaintiffs insist constituted stripping of Quarry No. 1. — The facts with *660 reference to this claim are set forth thereunder in the findings and show that plaintiffs were paid for stripping Quarry No. 1 in accordance with measurements made and established by the contracting officer. The evidence does not establish that in making the measurements the contracting officer violated the provisions of paragraphs 57, 60, and 70 of the specifications, or that his decision as to the measurements for payment was arbitrary or grossly erroneous. Plaintiffs are therefore not entitled to recover under this claim.
Claim 19. $6,191¡..1$ for powerhouse concrete alleged, to have been paid for as training-wall concrete. — The contract and specifications provided that concrete in the powerhouse below the generator floor should be paid for at the rate of $10 a cubic yard and that concrete in the powerhouse above the generator floor should be paid for at the rate of $15 a cubic yard, and that in the training-wall should be paid for at $3 a cubic yard. The contracting officer classified and paid plaintiffs for all of this combination wall as training-wall concrete at $3 a cubic yard. Plaintiffs protested and made claim for payment for a portion of this combination wall for training and powerhouse concrete under paragraph 119 of the specifications. The claim was denied.
Other walls of the powerhouse, as shown by the contract, were from 2 to 5 feet thick. This combination wall was 8 feet thick, as was the rest of the training wall. The training wall downstream from the combination training and powerhouse wall was first constructed, and the combination wall was constructed at the same time as were the other powerhouse walls.
The original contract drawings (5133-51, 52, and 62) showed the north wall of the powerhouse extending 3 feet into the left training wall, that is, 3 feet of the wall was shown as powerhouse wall, and 5 feet as training wall. Paragraph 119 of the specifications provided that the unit of work item of the schedule “Concrete in spillway training walls” included all concrete in the training walls “except the portion of the powerhouse which sets 3 feet into the left training wall.”
*661 It seems clear under this specification that plaintiffs were entitled to be paid for 3 feet of this combination wall as powerhouse concrete. On this basis there is due plaintiffs the additional amount of $2,769.48, which, in our opinion, is the amount which they are entitled to recover.
Plaintiffs contend, however, that under a revised design of the powerhouse the north wall was moved farther north which made this wall extend itself 7% feet into the left training wall and that, on this basis, they were entitled to recover $6,194.43. However, this was a change in design and location of the powerhouse which the evidence does not show resulted in any material increase in work or cost. Plaintiffs are, therefore, entitled to recover only the amount due under and in accordance with the provisions of paragraph 119 of the specifications at the unit prices stated in the schedule under art. 1 of the contract.
Claim 20. $2,514-W for excavation from borrow pit of material necessary for earth cushion over rock below concrete slabs in highways. — The solution of this claim depends upon the facts which are set forth in the findings. The contracting officer and head of the department denied plaintiffs’ claim for payment at $1.50 a cubic yard under contract item No. 11 in the schedule in art. 1 of the contract for “common excavation for highways” on their construction of paragraph 78 of the specifications entitled “Earth fills for highways.” This paragraph provided that the earth fills for both the main and branch highways, where these were not located on dams, should be constructed from required excavation for the highways, where the excavated materials were suitable but “that the contractor will not be required to use such excavated material when it is located on the opposite side of the river from the fill being constructed.” The paragraph further provided that if there were not sufficient suitable materials available from required excavation for the highways, additional materials should be secured from other required excavation or from approved borrow pits. This paragraph then provided that “Except as otherwise provided for materials on the opposite side of the river, the contractor shall move all required materials to the highway' *662 fills regardless of the length of haul.” Further provisions were contained in this specification not material here, and the specifications concluded with the following provision:
The cost of constructing the earth fills, including all hauling of materials regardless of length of haul, and doing all work described in this paragraph shall be included in the unit prices per cubic yard hid in the schedule for excavation for highways or for other required excavation: Provided, That payment for excavating the materials used in these fills from approved borrow pits, if such materials are required, as determined by the contracting officer, will be made at the unit price per cubic yard bid in the schedule for common excavation for highways, in which case the materials will be measured for payment in excavation in the borrow pits.
As originally prescribed by the contract and specifications, this roadway was to be constructed on the rock surface as excavated, but by change order No. 2, dated January 6,1932, the contracting officer required plaintiffs to excavate the rock surface to an elevation of 1 foot below subgrade. After the excavation so ordered had been made an earth cushion of 1 foot in thickness was required by the contracting officer to be placed in the manner specified by him on the foundation as so excavated on which was to be laid the concrete slabs. The placing of the earth cushion and the paving on this road were done at the earliest possible date. When' the road had been excavated in accordance with the change order and was ready for the earth cushion, required to be placed thereon by the contracting officer, there was no required excavation going on and' there was no other required excavated material available on the same side of the river on which this road was located. It was therefore necessary for plaintiffs to obtain, and they did obtain, the material necessary for the making of this earth cushion from borrow pits and areas where Madden Dam required excavated material had been wasted by direction of the defendant, both of which were on the opposite side of '¡the river. The excavation work, which was necessary to be done by plaintiffs in order to obtain suitable material for this earth cushion, was not “required excavation” for other features of the *663 work but was, within the meaning of the provisions of paragraph 78 of the specifications, “excavation from borrow pits approved by the contracting officer,” and such materials were required within the meaning of this specification. Although the contracting officer did not “order” plaintiffs to obtain this material from the borrow pit, he did not determine or instruct the plaintiffs that the material should be obtained elsewhere. In fact there was no other suitable material available from “required excavation,” and there were no other borrow pits. In the circumstances and upon the facts disclosed, the contracting officer erroneously interpreted the provisions of paragraph 78. Plaintiffs should have been paid the contract price for excavation of the material necessary to make this earth cushion. They were not so paid and judgment will be entered in their favor for $2,514.47 for 1,676.31 cubic yards so excavated at $1.50 a cubic yard under unit item of work #11 in accordance with paragraph 78, supra.
Claim 21. $3,117.40 for alleged additional rook excavation in blocks 13, 14, and 15 of Madden Dcom. — The facts established by the record with reference to this claim, which have been set forth thereunder in the findings, show that plaintiffs are not entitled to recover. Plaintiffs insist that the rock excavation in these blocks was made to the lines and grades, including hand trimming as established and directed by the contracting officer, and that subsequently the contracting officer required them to do further excavation by hand to remedy certain unforeseen conditions encountered in the nature of the rock, and that, for this reason, they were entitled to recover the amount claimed as the cost of so excavating 1,430 cubic yards. This contention is not established by the evidence, and upon the facts set forth in the findings the plaintiffs were properly paid for this excavation under unit of work item 6 at $3.10 a cubic yard.
Claim 22. $1,346.92 for certain special features of work ordered and performed. — The material facts with reference to the five items making up this claim are set forth in the findings. As the work of excavating Madden Dam foundations proceeded, plaintiffs were ordered by the contracting officer from time to time by drawings and written instructions *664 to make changes or additions not shown on the contract plans or referred to under the specifications. Plaintiffs performed the additional work as described in the findings. They were informed that this extra rock excavation would be paid for as general rock excavation for Madden Dam at $3.10 a cubic yard. They protested and claimed that they should be paid for this work, which was required to be done by hand, as for other similar rock excavation provided for in the contract. The contracting officer and the head of the department concluded that the specifications, as interpreted by them, required this rock excavation to be classified as Madden Dam excavation. No findings of fact were made. It was conceded that the work ordered and performed was more expensive and difficult than the rock excavation from Madden Dam but the contracting officer ruled that the rate of pay for rock excavation was not based upon the difficulties involved but on the location of the rock and therefore held that payment could only be made under the specifications as for. rock excavation for Madden Dam at $3.10 a cubic yard. In our opinion this conclusion was erroneous. The intent and purpose of a unit-pi'ice contract is to establish various prices for the various kinds or classes of work required to be performed so that there will be a fair i'elation between the cost of performing the work and the compensation to be paid therefor. The many provisions of the contract and specifications show very clearly that it was the character and cost of the work required to be performed that should be made the basis for determining the amount to be paid therefor rather than the location of the work. While location may properly be considered an element in deter-' mining the proper price, the nature, difficulty, and cost of the work required to 'be performed in a contract like the one in suit are the most important and determining factors.
Upon the facts established by the record the claim made by plaintiffs for $1,346.92 is reasonable and is allowed.
Claim 23. $ff!71 for rooh excavation for a cut-off trench "below tailrace slope paving. — This claim concerns the correct interpretation of the contract drawings and specifications, paragraphs 65 and 66, as to the classification for this rock excavation of 6.48 cubic yards. The trench in ques *665 tion for which the rock excavation was made by hand was ■shown on the drawings as a “cut-off trench,” and it was so in fact. The contract and specifications fixed a rate of $10 a cubic yard for excavation for a cut-off trench, but the contracting officer and the head of the department on the basis of their interpretation of the drawings and specifications held that this excavation “does not appear to be rock excavation for cut-off trenches” as described in paragraphs 65 and 66 of the specifications. Upon this interpretation they paid for this excavation at $3.10 a cubic yard under contract item 6 as excavation for Madden Dam. The excavation as made was clearly for the purpose of providing a cut-off trench and the excavation was of the same character and it performed in the same way as rock excavation for other cut-off trenches which the contract required should be paid for at $10 a cubic yard. The contracting officer, having ordered this work in a written change order with a revised drawing, thereby necessarily changed the specifications which he erroneously construed when making payment. Article 2 of the contract provided that anything mentioned or shown in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, should be of like effect as if shown or mentioned in both. Any change which the contracting officer made and ordered in the contract drawings by revised drawings, correspondingly, and to the same extent, changed the specifications with reference to the work required to be performed. A drawing and change order which added a cut-off trench required that it be paid for as a cut-off trench. Paragraph 43 of the specifications, so often relied upon by the contracting officer, specifically so provided as to increased quantities.
Plaintiffs are entitled to recover on this claim, and judgment will be entered in their favor for $44.71.
Claim 24. $14,756.73, balance alleged to be due on aoaownt of changes made in the design and the concrete construction of certain portions of the powerhouse. — The original contract plans and specifications for the powerhouse showed and called for placement in mass form of a great deal of concrete which, by subsequent changes and revised draw *666 ings accompanied by change orders from the contracting officer, was required to be placed in other than mass form and, at the samé time, required placement in a more expensive manner. Some of the changes in design were (1) A change in the design of the draft tubes; (2) Lowering the floor of the pit for future unit No. 3 from elevation 98 to elevation 93; (3) Lowering the mass forming the turbine floor from elevation 113.50 to elevation 108.75; (4) The addition of a passageway below the turbine floor extending from the pit for future unit No. 3 to the south end of the building, the floor level of this passage being at elevation 92. The original drawings showed small pits to provide access to the draft tube tops instead of the passageway required by the change; (5) Increasing the cross sectional area of the cable tunnel; (6) Adding a depression below the floor at elevation 119.50 of the passageway; (7) Extending the east walls of the various rooms at the generator floor level N/2 feet to the east, and raising the ceiling height over part of the area occupied by these rooms; (8) Enlarging the oil room and extending its north' wall toward the spillway section of the dam; and (9) Lowering a portion of the transformer platform area from elevation 144 to 142.50.
Some of the other changes ordered, reducing the placement of mass concrete and requiring the performance of work which was more difficult and expensive than originally called for, were:
(1) The originally prescribed bearing walls to support the generator Units Nos. 1 and 2 were replaced by elaborate columns, beams, and girders requiring expensive form work. (2) The temporary supports for the generator floor for future Unit No. 3 were replaced by the same elaborate concrete column, beam, and girder construction later required for Units Nos. 1 and 2. • (3) Steel stairs were replaced by more expensive reinforced-concrete stairs, which required only a small yardage of concrete, but much more expensive to construct and install. (4) An operating balcony was added which consisted of very expensive reinforced-concrete construction. (5) Thin walls for housing the potential transformers, panel boards, etc., were required *667 by the' change order, not contemplated originally. And (6) saddles involving small quantities of concrete were used to support the outlet pipes throughout the powerhouse.
One hundred and forty (140) changes were made by the contracting officer in the construction of the powerhouse, and each change required was shown on the revised drawings prepared and delivered to plaintiffs with a letter ordering the work to bo performed as changed, and stating as follows:
The additional information conveyed to you through these drawings involves no change in contract unit prices, nor extension of time, nor increase in the amount of work to be performed under your contract.
These changes were made, and ordered by the contracting officer over a period of several months. The revised drawings and letters making and ordering the changes which caused increased costs to plaintiffs over and above the costs of performing the work involved in such changes as shown upon the original contract drawings and called for by the contract and specifications were delivered to plaintiffs October 17 and December 27, 1933, and March 22 and April 13, 1934. These changes related to the more difficult and expensive work required to be done by the change orders over what such work, as called for by the original drawings and specifications, would have cost. The contracting officer based the statements made in his written change orders, that the changed drawings involved no change in the contract unit prices nor increase in the amount of work to be performed under the contract, upon his interpretation of art. 3 of the contract and paragraph 43 of the specifications. He made no computation or determination for the purpose of arriving at a decision as to whether the actual and necessary cost of performing the work as changed was in excess of what such work, as originally called for by the contract and specifications, would cost. His conclusion was merely that any change in any part of the work called for by the contract, drawings, and specifications, for which there was provided a unit price for the work as originally specified, should be paid for at the same unit prices.
*668 Plaintiffs performed tbe work strictly in accordance with the requirements of the change orders at an actual increased cost over what the work involved in the change orders would have cost, had plaintiffs performed in accordance with the original contract, drawings, and specifications, of at least $8,000.
The defendant’s concrete technician, who was a competent engineer of long experience in work of this kind, testified that the work as changed and performed by plaintiffs was much more expensive than the work originally called for and specified, and that a person making a unit price bid for the work as originally called for would not have taken into consideration the increased costs necessary to perform the work as changed and required.
Plaintiffs did not protest and make claim for equitable adjustment under art. 8 of the contract within ten days after receipt of any of the change orders, or after receipt of the last change order, but on October 29, 1934, plaintiffs made written protest and claim for extra compensation on account of additional cost necessarily incurred in performing the work specified and required by the revised drawings and change orders. The engineer of maintenance acting as contracting officer under proper authority from the head of the department considered the protest and claim on their merits and denied them on the ground “that the changes made were reasonable changes, such as are specifically authorized under art. 3 of the contract and paragraph 43 of the specifications. * * * And since claim was not made in accordance with the terms of the contract [art. 3 of the contract and par. 6 of the specifications], it is felt that your claim for extra compensation must be disapproved.” Plaintiffs timely appealed to the head of the department who also considered the protest and claim on the merits and denied them on the ground that plaintiffs had been paid for the work performed as required by the contract and specifications. Plaintiffs claim that paragraph 43 of the specifications, when properly interpreted in the light of art. 3 and other provisions of the contract, did not authorize the changes here made without a determination of the necessary increased costs and the making of an *669 equitable adjustment in the original unit price applicable to the work before changed. In this they are correct. By reason of the manner in which changes were ordered, the large number thereof, the period of time over which the change orders were made, and the fact that the work, as changed, was not completed until late in 1934, it was difficult for plaintiffs to prepare and make a specific protest and claim. We are of opinion in the circumstances that since the contracting officer and head of the department had the right to extend the time for filing of a protest and claim under any change ordered, by considering and deciding the protest and claim on the merits they effectively waived the late filing thereof. Charles Thompson et al. v. United States, supra, decided May 6, 1940. Moreover it was the clear duty of the contracting officer under art. 3 of the contract to determine as a fact, when he made the changes involved, whether such changes would cause an increase in cost of doing the work as required by the change order over the cost as originally specified and called for and, therefore, whether there was an increase in the amount due under the contract, and, if so, to make an equitable adjustment accordingly. This he failed to do when he made and ordered the changes. Instead he based his advice to plaintiffs in the change orders on his interpretation of art. 3 of the contract and paragraph 43 of the specifications, under which he thought plaintiffs were not entitled to any additional compensation, regardless of the cost.
The contract provided that the concrete work in the powerhouse as originally called for should be paid for at the rate of $10 a cubic yard for all concrete work below the generator floor and $15 a cubic yard for all concrete work above the generator floor. The reason for this difference in price was that the concrete work originally specified and called for by the contract above the generator floor was more difficult and expensive to perform than that below the generator floor. Plaintiffs contend that by reason of the fact that the work called for and required to be performed in accordance with change orders both below and above the generator floor was more expensive than that originally called for, the changed work below the generator floor *670 should be paid for at the rate of $15 a cubic yard instead of $10 for the reason that such changed work was comparable to the work originally required above the generator floor; and that the changed work required and performed above the generator floor should have been paid for at the rate of $20 a cubic yard for the reason that such work-was comparable to concrete work in the counterforted wall. In support of this contention plaintiffs rely upon paragraph 117 of the specifications which provides that “Any required concrete, for the works covered by these specifications, not definitely covered by an item of the schedule shall be included for payment under the item of the schedule which most nearly applies as determined by the contracting officer : * * But plaintiffs’ contention on this point is not sustained by the record.
Judgment will be entered in favor of plaintiffs on this claim for their actual increased costs of $8,000. See finding 72.
Claim 25. $285.51 for certain mipaid hills rendered, by ;plaintiffs for work which they allege was outside the requirements of the contract. — The facts with reference to the five items making up this claim are set forth thereunder in the findings. Upon these findings we are of opinion that plaintiffs are not entitled to recover on the first four items, but that they are entitled to recover the amount of $77.98 under the fifth item of the claim. The amount of this item represents the cost to plaintiffs of replacing certain concrete rendered defective by reason of certain air-pressure tests made by defendant’s authorized inspectors before the concrete had sufficiently set to permit such tests to be made. The defendant’s concrete technician, a competent and experienced engineer in charge of this work, testified that the concrete required to be replaced was not damaged through any fault of the plaintiffs.
Judgment will therefore be entered in favor of plaintiffs on this claim for $77.93.
Claim 26. $10f.5J¡., cost for chipping concrete surfaces at horizontal construction joints alleged to have been in excess of work required by the specifications. — This claim presents *671 the question whether the manner in and the method by which the defendant required plaintiffs to clean the concrete surface at the construction joints before placing additional concrete thereon resulted in costs exceeding those required by paragraph 111 of the specifications. Upon the facts established by the record and set forth in the findings under this claim, we are of opinion that the manner in which the concrete was required to be cleaned was authorized by the specifications and that the work of cleaning these surfaces, for the expense of which plaintiffs claim additional compensation, was not extra work outside the requirements of the contract. Plaintiffs are therefore not entitled to recover.
Claim 27. $279.22 for a, change made under which 'plaintiffs were required to pay for erection holts furnished hy the manufacturer of drum gates. — In view of th¿ facts'established by the record and set forth in the findings under this claim, we are of opinion that plaintiffs are clearly entitled to recover the amount which the defendant required them to pay for erection bolts necessary for the erection of the drum gates on Madden Dam. A proper interpretation of the provisions of paragraphs 40, 41, and 148 of the specifications discloses that it was the intent and purpose of the contract and specifications that the Government in furnishing the material to be installed would also furnish the erection bolts for such equipment which were necessary to hold the equipment in place until it was permanently fastened or riveted. The drum gates were to be furnished by the Government under paragraph 40 of the specifications, and that paragi’aph also provided that the defendant would furnish anchor bars, rods, and bolts. Other paragraphs of the specifications also show that “a supply of rivets and erection bolts for field erection will be furnished by the Government as provided in paragraph 40.” Erection bolts for the drum gates were furnished by the manufacturers but, when the gates were delivered for assembly and installation, there was not a sufficient number of erection bolts for that purpose and the defendant furnished them, for which it made a charge of $279.22 against plaintiffs. We are of opinion that this charge was clearly erroneous and unauthorized and that refund thereof should be made to plaintiffs.
*672 Judgment will therefore be entered in favor of plaintiffs for $279.22 under this claim.
Claim.28. $8J$.89, cost alleged to be due for sawing drum gate hmge eastings. — The facts established by the record and set forth in the findings thereunder show that plaintiffs are not entitled to recover. In substance the facts show that the sawing of the drum gate hinges was necessitated by the manner in which the plaintiffs performed certain welding* work on drum gate No. 1, which was the only gate on which it was found necessary to saw off a portion of the hinge casting. By a change in the method of welding on drum gates Nos. 2, 3, and 4, no difficulty was encountered and no sawing of hinge castings was necessary. The contracting officer correctly denied this claim on the facts.
Claim 29. $310.07 for alleged breach of eontraet in not permitting plaintiffs to transport certain materials. — Paragraph 165 of the specifications, entitled “Transporting Government materials from shipping point to powerhouse,n provided as follows:
the Government contemplates doing certain work at the site of the works during the period of the contract for the work under these specifications, and it is possible that work other than that now contemplated will be done by the Government during the contract period. It is expected, however, that the major feature of work by the Government will be the installation of the hydraulic and electrical power generating machinery. The Government will also install power and other machine tools in the machine shop in the powerhouse. The contractor shall unload and haul, or otherwise transport, all materials and equipment for the Government or its agents for installation or use at the site of the work by parties other than the contractor, as directed by the contracting officer, in any amount and regardless of size, shape, or kind of material or equipment, between Madden Siding and the powerhouse, whether delivered to the contractor on trucks or railroad cars at the Madden Siding, and as delivered to the contractor at any location in the power house for hauling to Madden Siding.
This paragraph further provides that the contractor would be charged for any such materials lost or damaged after delivery to him, and prior to the time they should be deliv *673 ered in proper condition at the required destination, the same amount that the materials so lost or damaged cost the Government at the point of delivery to the contractor. The paragraph concluded -with the statement that payment for unloading, hauling, or otherwise transporting, and caring for the Government materials during the time of transportation would be made at the unit price per hundredweight bid in the schedule for transporting materials of all kinds for the Government or its agents in any amount between Madden Siding and the powerhouse.
Unit work item 94 under art. 1 of the contract provided a unit price of one dollar per cwt. for transporting materials of all kinds for the Government, or its agents, in any amount between Madden Siding and the powerhouse.
We think it is clear that the contract contemplated that plaintiffs would be required and have the right to transport all Government materials. necessary to be transported to Madden Dam. The phrase “as directed by the contracting officer” in this paragraph meant that the contractor would transport the Government materials when and in the manner directed by the contracting officer and it did not mean that the Government would have the right to take from plaintiffs the right to haul such materials at contract prices and itself do such hauling or give the work to someone else. In this respect the case differs from the facts and contract provisions in Bulkley v. United States, 7 C. Cls. 543; 19 Wall. 37. Both parties had agreed that plaintiffs should transport these materials and plaintiffs had provided the necessary transportation facilities and were at all times ready and willing to transport any materials or equipment in any amount, size, shape, or kind, as required by the contract. Plaintiffs did transport certain of the Government materials, but by oversight, or otherwise, defendant’s employees hauled 36,088 pounds of material covered by the specifications from the Panama Shops and elsewhere to Madden Dam, which plaintiffs, under the contract, had a right to haul at the unit price agreed upon. The record establishes and we have found as a fact that plaintiffs’ actual damage on this account was $310.07, about which there was and is no dispute. The contracting officer and head of the depart *674 ment did not pay plaintiffs for the reason they concluded that as this was a claim for damages they were not authorized as administrative officers to adjust and settle it.
Judgment will be entered in favor of plaintiffs for $310.07.
Claim 30. $él5.2J¡, balance due for installing mooring outrigger on trash-rack structure. — This metal mooring outrigger was made and installed by plaintiffs pursuant to written orders of the contracting officer and in accordance with drawing 5137-587 furnished by such officer. The change was ordered February 7, 1934, but plaintiffs did not protest and make claim therefor under unit price item 93, “Installing miscellaneous metal work,” until October 19, 1934. This protest, and claim were made when the defendant paid plaintiffs for this extra work under unit work item 76, “Installing trash rack metal work” at one cent a pound. Plaintiffs protested this classification and claimed payment therefor under contract item 93, above, at ten cents a pound. The construction engineer, who had no authority to extend the time for filing claims or to waive that provision in the contract, denied the claim on the ground that protest had not been made as required by paragraph 6 of the specifications within ten days after the change was ordered. Plaintiffs appealed to the engineer of maintenance who considered and decided the protest and claim on the merits and held that this was not such extra work as required an extra work order under art. 5 of the contract but that it was authorized within the meaning of paragraph 43 of the specifications. He further held that the mooring outrigger was properly a part of the trash-rack structure called for by the contract as modified by the change order, and that the installation of same was properly classified for payment at the unit price specified in item 76 for installing trash rack metal work at one cent a pound. On appeal to the head of the department, the decision of the contracting officer was affirmed. The contracting officer and the head of the department, .based their decision on their construction of the specifications. By considering and deciding the case on the merits they waived the provision with reference to the filing of protest and claim within ten days from the date the work was ordered. We think they incorrectly interpreted the *675 provisions of the pertinent specifications. Paragraph 43 of such specifications has no application to the claim involved. In the division of the specifications entitled “metal woek,” paragraph 133, entitled “Installing metal work, general,” after- referring to numerous articles of equipment and metal work to be furnished by the Government under paragraph 40, provided that “the contractor shall attach to or build into the dam, power plant, and appurtenant works all such metal work, and shall install all such gates, valves, hoists, and machinery in a workmanlike manner, as shown on the drawings or as directed by the contracting officer.” This provision had reference to the designated metal work and equipment therein immediately above mentioned. This paragraph further provided that “Except as otherwise provided in these specifications, payment for installing and painting all metal work and machinery will be made at the unit prices bid in the schedule for installing the various items of metal work, * * *. The cost of * * * installing, and painting miscellaneous items of metal work, not directly appurtenant to gates, valves, or other features specifically provided for, such as brackets, anchor bolts, and any other metal work to be permanently installed as parts of the completed work, will be paid for at the unit price bid in the schedule for ‘Installing miscellaneous metal work.’ ” Other paragraphs of the specifications which followed related directly to specific items of metal work, painting, etc. Paragraph 149 of the specifications entitled “Trash rack metal work” provided that trash-rack bars, castings, structural steel supports and guides, anchor plates and bars for all trash racks, and guides for the rake for the pen stock trash-rack structure would be furnished by the Government under provisions of paragraph 40. This paragraph then proceeded to direct how these trash racks should be constructed and installed and stated that “Payment for installing and painting all trash rack metal work, except, as otherwise provided in paragraph 146 for trash racks over the inlets to the drum gate chambers, will be made at the unit price per pound bid in the schedule for installing trash rack metal work.”
*676 The next division of the specifications entitled “windows, dooRS, and other misoellaMEotts items” has various numbered paragraphs of the specifications dealing specifically with various items under that heading, and paragraph 164, entitled “Miscellaneous metal work,” provides as follows:
Installing and painting hatchways, manholes, oil tanks, metal ladders, ladder rungs in concrete, gratings, stair nosings, anchor bars, rods and bolts set in concrete for installation of permanent equipment, dram boxes and gratings, brackets, and other miscellaneous metal work not specifically included in other items of the schedule, for which installation and payment has not been specifically provided for elsewhere in these specifications and which are to be furnished by the Government and become a part of the completed work, will be paid for at the unit price per pound bid in the schedule for “Installing miscellaneous metal work,” Avhich unit price shall include the cost of unloading, storing, hauling, handling, painting where required, and the complete installation of this metal work, as shown on the drawings or as directed by the contracting officer.
The mooring outrigger ivas not shown on the original drawings or mentioned in any of the specifications, but in view of the specific provisions of the specifications above mentioned and quoted, we think it is clear that the mooring outrigger, Avhich was a metal ladder-like structure, was not a part of the “trash rack metal work” within the meaning of paragraph 149 but was “miscellaneous metal work” described and intended by paragraph 164, supra. Payment for installation thereof should therefore have been made under the written order by the contracting officer therefor at the contract price of ten cents a pound for installing miscellaneous metal work. The contracting officer did not fix the price or the classification in his order of February 7, 1934. Judgment will therefore be entered in favor of plaintiffs for $215.24.
Claim 31. $171.82 under a change order requiring the construction of a concrete stairway ami handrail leading to AdÁt entrance in block No-. 1, Madden Dam. — Under the original contract drawings there was shown, as a part of the system, galleries or passages in the mass concrete of the main dam immediately adjacent to the right abutment and near the *677 top of the dam as an exit in block No. 1 to be accessible from the sidewalk on top of the dam through supplementary structures; namely, a cantilever concrete landing and an inclined concrete runway or ramp with pipe handrail. This structure was simple of construction; however, the contracting officer changed the drawings and issued a change order substituting for this ramp and pipe handrail a concrete landing with a concrete stairway protected by concrete handrails or balustrade, and the work was performed in accordance with this ordered change. The making of this structure and the performance of this work as changed were more difficult and expensive than originally called for, but the defendant, when the time came for payment, classified this work and paid for the same under unit work item 48, “Madden Dam concrete,” at $2.50 a cubic yard. The concrete work necessary to be performed in constructing this concrete stairway and balustrade was concrete outside the limits of the main dam structure and was of a kind entirely different from the mass concrete in the body of the dam. This concrete work was of a class and was required to be performed in a maimer similar and corresponding to the work called for under unit of work item 51 in the schedule under art. 1 of the contract for “Concrete in spillway bridge, and in parapets on abutment section of Madden Dam,” at $10 a cubic yard, and should have been so classified and paid for under paragraph 117 of the specifications. This paragraph provided, among other things, that “Any required concrete,. for the works covered by these specifications, not definitely covered by an item of the schedule, shall be included for payment under the item of the schedule which most nearly applies as determined by the contracting officer.” The contracting officer and the head of the department denied the claim on their construction of paragraphs 43 and 118 of the specifications and paid for this work, as changed, as Madden Dam concrete. This construction of the specifications was erroneous. Under the change as made and ordered the defendant obtained a better and more expensive structure than that originally specified and called for in the contract. The concrete work required and performed under the change order in the Adit entrance *678 was not covered specifically by any item of the unit price schedule, but it compared very closely with the work covered by unit price item 51 and we think plaintiffs are entitled to recover on that basis.
Judgment will be entered in favor of plaintiffs for $171.82.
Claims 32 and 33. $2^7.20, damages assessed and collected from plaintiffs for grout pipes reported obstructed; and fon% $98.1ft, deductions mode from payment for drilling grout holes S-K and 3-N. — The facts established by the record and set forth in the findings under these claims show that plaintiffs are entitled to recover thereon. Claim 33 is similar to Claim 11.
Plaintiffs protested and made claim for refund of damages assessed and collected and for the deductions made, but the contracting officer and the head of the department held on the basis of their construction of. paragraph 89 of the specifications that the claims were not allowable. In this we think they erred. Paragraph 89 of the specifications, entitled “Drilling grout holes,” is set forth in finding 42.
Paragraph 90 of the specifications was a general provision relating to pressure grouting, and paragraph 91 related to pressure grouting foundations of Madden Dam; paragraph 93 related to pressure grouting contraction joints of Madden Dam. Paragraph 139 of the specifications entitled “Pipe for grouting contraction joints in Madden Dam” contained directions as to the systems of pipes and fittings to be placed for grouting purposes, and stated that “great care shall also be taken to insure that all parts of the system [of pipes installed for grouting purposes] are maintained free from dirt or any foreign substance whatever”, and that:
After each grouting system is placed and the concrete around it completed and at such other times as the contracting officer may direct, the pipe shall be tested by forcing a current of air under pressure through it to the satisfaction of the contracting officer, after which it shall be immediately temporarily capped or otherwise closed to avoid the possibility of any foreign substance entering it until it is. pressure grouted. Any pipe that is found to be or becomes clogged due to any cause during the construction of the dam and before it is *679 pressure grouted, shall, if practicable, be cleaned or opened up to the satisfaction of the contracting officer. For any pipe which the contractor fails to open up or to replace to meet this test the contractor shall pay to the Government as fixed, agreed, and liquidated damages the sum of two dollars ($2) per linear foot of the total length of that pipe which is thereby made ineffective as determined by the contracting officer.
In view of the facts established by the record and set forth in the findings, we are of opinion that the contracting officer erroneously interpreted the provisions of paragraphs 89 and 139 of the specifications.
As pointed out in the first part of this opinion, the contracting officer was not justified in construing the specifications broadly in favor of the Government; since they were prepared and written by the defendant, they must in case of doubt, be construed more favorably in favor of the contractor. It seems clear to us from a reading of the specifications that the clogging of or obstruction in the grout pipes or holes as a result of which a charge might be made against the contractor, meant, and it was intended to mean, obstruction of such pipes or holes by reason of failure of the contractor suitably to cap or otherwise close the holes or open ends of the pipes. This the plaintiffs did and there is no claim to the contrary. We think it is clear-that plaintiffs cannot be penalized when they performed the work involved, in these claims strictly in accordance with the specifications. In Moore, Receiver, v. United States, 46 C. Cls. 139, 172, 173, it was held:
It is true that the contractors by these provisions of the contract agreed to construct the dry dock “under the _ inspection and supervision” of the Government engineer, and “subject to his approval”; but we do not think that they thereby agreed to suffer any and all losses which might occur to them by reason of his mistakes in directing the manner in which the work should be done.
Since the specifications, provided what plaintiffs should do in order to prevent the pipes and grout holes from becoming obstructed or clogged it seems that, if it had been intended that plaintiffs should be held responsible for or charged with any *680 obstruction directly resulting from a cause other than failure to protect the pipes or holes as specified, some specific provision would have been made to that end and the failure of the specifications so to provide relieves plaintiffs of any responsibility other than as a result of their negligence, which did not exist and which is not claimed. There is nothing to indicate that the specifications contemplated or intended that plaintiffs should be penalized should the grout holes or pipes become completely filled with grout from grouting operations carried on through other pipes and holes. An assumption, which we think is more reasonable than that made by the contracting officer, would be that the specifications as written probably contemplated that if such grout holes or pipes should become completely filled with grout from other grouting operations, this would be the same as if such holes had been directly grouted.
Moreover, with reference to Claim 83, it appears that a water test was made by defendant instead of an air test as required by paragraph 139 of the specifications. See Sobel v. United States, 88 Ct. Cls. 149, 167.
Plaintiffs are entitled to recover and judgment will be entered in their favor on these claims for $2,525.60.
Claim 34. $51Jfi for improper classification of and payment for cable raclc hooks and conduit channel supports.— This claim involves the correct interpretation of the provisions of paragraph 156 of the specifications quoted thereunder in the findings. The contracting officer and the head of the department interpreted this specification as requiring that, for the purposes of payment, these metal hooks and supports be treated as a part of the conduits. Plaintiffs protested and appealed, claiming that these hooks and supports which were a part of the conduit racks should be paid for under unit price item 93 for “Installing miscellaneous metal work” at ten cents a pound under the provision of paragraph 156 which provided that “Payment for installing metal inserts, anchor bolts, and bolts for mounting conduit pipe straps and conduit racks, and for installing conduit racks will be made at the unit price per pound bid in the schedule for installing miscellaneous metal work.”
*681 We are of opinion that plaintiffs are correct in this interpretation and judgment will be entered in their favor for $51.40.
Claim 35. $18,885.03 for deductions made at time of final payment on final estimate for (a) rock excavation, item 6; (b) common excavation, item 5; and (c) common excavation of cut-offs with side slopes for Left Ridge Dam and Saddle Dams, item 8. — Under the facts disclosed by the record and set forth in the findings, the plaintiffs are not entitled to recover on this claim. They did not protest and make claim to the contracting officer or the head of the department on these items. The reason they did not do so was that the work had been completed, and these matters arose at the time when final payment under the contract was being made when everyone was anxious to finish all the matters relating to this large project which had been going on for a little more than three years. Plaintiffs did, however, reserve these claims in the total amount of $11,928.18 in the final release which they executed. The evidence of record does not establish that the net reduction made on recalculation, when the final estimate was prepared for the purpose of final payment, was erroneous. Plaintiffs contend that under paragraph 58 of the specifications, as quoted in the findings under this claim, the monthly estimates and progress payments were correct, final, and conclusive. But we cannot sustain this contention.
Claim 36. $683.78 for charges made by the defendant for cement used in filling over excavation. — Upon the facts established by the record and set forth in the findings, under this claim we are of opinion that plaintiffs are not entitled to recover and that the contracting officer correctly denied plaintiffs’ protest and claim under the provisions of paragraph 116 of the specifications.
Judgment will he entered in favor of plaintiffs for the total sum of $303,566.63. It is so ordered.
Green, Judge/ and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.